**RAILROAD COMMISSION
OF TEXAS, Petitioner,**

v.

**GULF ENERGY EXPLORATION
CORPORATION, Respondent.**

No. 14–0534

Supreme Court of Texas.

Argued September 22, 2015

OPINION DELIVERED:
January 29, 2016

David Roberts, Roberts, Roberts, Odefey & Witte, LLP, Port Lavaca, Kenneth R. Wynne, David Edwards Wynne, Wynne & Wynne LLP, Houston, for Respondent.

Joseph David 'Jody' Hughes, Assistant Solicitor General, Jonathan F. Mitchell, Solicitor General, J.R. Schneider Jr., Assistant Attorney General, Gaston M. Broyles Jr., Assistant Attorney General, Daniel T. Hodge, First Asst. Attorney General, Gregory W. Abbott, Attorney General, Charles Kenneth Eldred, Financial & Tax Litigation Division, Office of the Attorney General, Austin, for Petitioner.

Justice Lehrmann delivered the opinion of the Court.

After agreeing with an oil-and-gas lessee to postpone plugging several abandoned offshore wells, the Railroad Commission of Texas mistakenly plugged one of those wells. The lessee sued the Commission with legislative permission and obtained a favorable jury verdict on the lessee's negligence and breach-of-contract claims. The court of appeals affirmed the judgment on the verdict. The Commission complains that the trial court erred in failing to submit a jury question on a statutory good-faith defense, which the Commission contends forecloses its liability on both claims, and in failing to submit a question about whether the Commission and lessee entered into a binding contract before the well was plugged. We hold that the trial court erred in refusing to submit a jury question on the good-faith defense. We also hold that a fact question exists on the contract-formation issue. Accordingly, we reverse the court of appeals' judgment and remand the case for a new trial.

## I. Background

### A. Statutory Framework

This case arises out of the Commission's duties with respect to abandoned oil-and-gas wells, which are governed by Texas Natural Resources Code chapter 89. One of the statute's express purposes is to protect Texas's water and land from pollution by providing "additional means" for the plugging of abandoned wells. TEX. NAT. RES. CODE § 89.001. The statute and accompanying Commission rules place primary responsibility on an inactive well's[1] operator[2] to plug the well.[3] *Id.* §§ 89.011(a), .042(a); 16 TEX. ADMIN. CODE § 3.15(b)(1)(B), (d)(1)(B). Nonoperators, defined as persons with a working interest in a well who do not qualify as operators, have secondary plugging responsibility. TEX. NAT. RES. CODE §§ 89.002(a)(3), .042(b). If the Commission determines after notice and a hearing that a well has not been properly plugged, and the operator and nonoperator (if any) either cannot be found or do not have sufficient assets, the Commission may plug the well. *Id.* § 89.043(a); 16 TEX. ADMIN. CODE § 3.14(b)(3)(A).

Chapter 89 also provides a liability defense to those engaged in plugging opera-

---

**1.** An inactive well is "an unplugged well that has had no reported production, disposal, injection, or other permitted activity for a period of greater than 12 months." TEX. NAT. RES. CODE § 89.002(a)(12).

**2.** An operator is "a person who assumes responsibility for the physical operation and control of a well as shown by a form the person files with the commission and the commission approves." *Id.* § 89.002(a)(2).

**3.** In lieu of plugging an inactive well, the operator may restore the well to active status or seek approval from the Commission for an extension of the plugging deadline. 16 TEX. ADMIN. CODE § 3.15(b).

tions in good faith. Specifically, "[t]he commission and its employees and agents, the operator, and the nonoperator are not liable for any damages that may occur as a result of acts done or omitted to be done by them or each of them in a good-faith effort to carry out this chapter." TEX. NAT. RES. CODE § 89.045. The application of this defense is the parties' principal focus in this Court.

## B. Facts

In January 2008, the Commission issued orders requiring American Coastal Enterprises (ACE) to plug a number of inactive offshore wells the company operated in the Gulf of Mexico. Those plugging orders became final in March 2008. Because ACE did not have sufficient assets to carry out the orders—the company declared bankruptcy in May 2008—the Commission took over that responsibility. On April 24, 2008, the Commission awarded Superior Energy Services a contract to plug eight of the ACE wells, including the two at issue in this case identified as 707S–5 and 708S–5.[4]

When the plugging order was issued, Gulf Energy Exploration Corporation was the lessee of the offshore area that included the 708S–5, having acquired the lease from the General Land Office in 2007. Gulf Energy was considering applying to the Commission to take over as operator of some of the abandoned ACE wells. On May 19, 2008, representatives of Gulf Energy, ACE, and the Commission, including lawyers from the Attorney General's Office, met to discuss Gulf Energy's proposal. As of that date, Superior had commenced plugging operations and had al-ready plugged one of the eight wells. The representatives reached an oral agreement at the meeting that the Commission would delay plugging four of the remaining wells covered by the plugging order, including the 708S–5. Meanwhile, Gulf Energy would post a bond and would apply to the Commission to supersede the plugging order and take over as operator of those four wells no later than June 12, 2008. The other three wells, including the 707S–5, would be plugged as planned.

In the days following the meeting, the participants confirmed the terms of the agreement in a series of e-mails and reduced it to writing in a formal Settlement and Forbearance Agreement.[5] The Commission representative signed the written agreement on June 6, 2008, and ACE's president and Gulf Energy's CEO signed it on June 9. The bankruptcy court approved the settlement, and the Commission does not dispute that Gulf Energy fulfilled its obligations with respect to the bond and required Commission filings.

In September 2008, the Commission issued several orders superseding the plugging orders on the wells covered by the agreement and approving Gulf Energy's application to transfer their operation. A few months later, Gulf Energy discovered that the 708S–5 was plugged. As it turned out, the Commission had plugged the well on May 25, 2008 under the mistaken belief that it was plugging the 707S–5. The circumstances surrounding that error were the subject of the resulting lawsuit.

The mistake originated with an admitted clerical error by Commission employee

---

4. Offshore wells are identified by the tract number in the State's mapping system. Well 707S–5 is in tract 707, and well 708S–5 is in tract 708.

5. The Agreement stated that it was between ACE and the Commission and did not describe Gulf Energy as a party in the introductory language. However, representatives of ACE, the Commission, and Gulf Energy all signed the Agreement.

Jimmy Zambrano. Before the Commission contracted with Superior to plug the eight wells, Zambrano took aerial photographs of and prepared a plugging procedure sheet for each well. But Zambrano inadvertently transposed the coordinates for several of the wells, resulting in 708S–5's photo and coordinates being labeled as those of 707S–5, and vice versa. These mislabeled procedure sheets were provided to Superior with the plugging contract.

Gulf Energy's theory at trial was that Superior received information from Fugro Chance, Inc., the subcontractor Superior hired to perform sonar surveys of the ocean floor around the well sites in advance of the plugging operation, alerting it that the coordinates on the procedure sheets were incorrect. Gulf Energy presented evidence that Fugro Chance provided this information to Superior employees several days before the 708S–5 was plugged, and that they failed to pass it along to the boat crew conducting the operation. Gulf Energy also explored the theory that the crew members, including the Commission representative on board, ignored obvious indicators that they were at the wrong well when they mistakenly plugged the 708S–5.

## C. Procedural History

After discovering that the 708S–5 had been plugged, Gulf Energy sought and obtained legislative consent to sue the Commission. Specifically, the Legislature adopted Senate Concurrent Resolution No. 72, which authorized Gulf Energy to sue the Commission for no more than $2.5 million in damages, subject to Texas Civil Practice and Remedies Code chapter 107. Pursuant to chapter 107, the resolution did not waive the Commission's immunity from liability, nor did it waive any defense of law or fact "except the defense of immunity from suit without legislative permission." TEX. CIV. PRAC. & REM. CODE § 107.002(a)(7)–(8), (b).

Gulf Energy then sued the Commission and Superior for wrongfully plugging well 708S–5.[6] Gulf Energy's live pleading at trial included breach-of-contract and negligence claims against the Commission and Superior,[7] and a gross negligence claim against Superior. All claims were submitted to the jury, but Gulf Energy and Superior settled while the jury was deliberating.

During the charge conference, the Commission objected to the jury charge's failure to include a question on contract formation, arguing that a fact issue existed on whether the parties had a meeting of the minds when the contract was allegedly breached. The trial court overruled the objection and orally ruled that a contract between the Commission and Gulf Energy was formed as a matter of law before the well was plugged.[8] In effect, the trial

6. Gulf Energy also sued Fugro Chance for negligence and gross negligence, but the trial court dismissed those claims with prejudice and severed them from the underlying suit.

7. Gulf Energy also initially asserted fraud, negligent-misrepresentation, and gross-negligence claims against the Commission and sought exemplary damages. The Commission filed a plea to the jurisdiction, arguing that the legislative resolution waiving its immunity from suit did not extend to Gulf Energy's tort claims. The trial court denied the plea, and on interlocutory appeal the court of appeals affirmed as to the negligence claim but reversed as to the fraud and negligent misrepresentation claims as well as the request for exemplary damages. *R.R. Comm'n of Tex. v. Gulf Energy Exploration Corp.*, No. 13–10–015–CV, 2010 WL 3049083, at *6–*7 (Tex. App.–Corpus Christi Aug. 5, 2010, no pet.) (mem.op.). On remand, Gulf Energy amended its petition to assert only breach of contract and negligence.

8. It appears that the trial court initially made this ruling during the informal charge conference, which was not recorded. But the trial

court held that the parties had a binding contract when they reached the oral agreement on May 19, 2008—before the well was plugged—not when they signed the written settlement agreement three weeks later on June 9—after the well was plugged. The trial court also overruled the Commission's objection to the absence of a question on the Commission's good faith under Natural Resources Code section 89.045 and refused the Commission's requested good-faith question, which asked:

> Did the Railroad Commission of Texas, and its employees and agents, act in good faith in carrying out its policy as stated below:
>
> Natural Resources Code, Section 89.001. Policy—The conservation and development of all the natural resources of this state are declared to be a public right and duty. It is also declared that the protection of water and land of the state against pollution or the escape of oil or gas is in the public interest. In the exercise of the police power of the state, it is necessary and desirable to provide additional means so that wells that are drilled for the exploration, development, or production of oil or gas, or as injection or salt water disposal wells, and that have been abandoned and are leaking salt water, oil, gas, or other deleterious substances into freshwater formations or on the surface of the land, may be plugged, replugged, or repaired by or under the authority and direction of the commission.

The jury found that the Commission "fail[ed] to comply with its agreement to postpone plugging and abandoning the 708S–5" and that the Commission's negligence proximately caused Gulf Energy's damages.[9] On the negligence claim, the jury attributed 65% of the responsibility to Superior and 35% to the Commission. The jury awarded identical damages on each claim and awarded attorney's fees on the contract claim. Gulf Energy moved for entry of judgment on the contract claim. Taking into account the settlement credit and the damage limit in the resolution authorizing suit, the trial court rendered judgment in Gulf Energy's favor for $2.5 million, the maximum amount recoverable.

The court of appeals affirmed. 480 S.W.3d 570 (Tex.App.–Corpus Christi–Edinburg 2014). The court rejected the Commission's assertion of charge error on the contract question, holding that (1) the Commission waived its complaint that the question "erroneously assumes that the Railroad Commission entered into a legally-enforceable agreement" to postpone plugging the well, (2) even if preserved, any error was harmless, and (3) the Commission did not meet its burden to rebut the presumption that the contract was supported by consideration. *Id.* at *3, *8. The court of appeals also rejected the Commission's complaint of charge error on the negligence question, holding that the Commission waived its arguments that the proper standard was good faith rather than negligence and that the evidence conclusively established the Commission's good faith.[10] *Id.* at *9. We granted the Commission's petition for review.

---

court confirmed the ruling on the record during the formal charge conference.

9. The jury also found Superior liable for breach of contract, negligence, and gross negligence, but the settlement rendered those findings moot.

10. The court overruled several additional complaints about the negligence question and related instructions, as well as complaints related to the damages award, but the Commission does not challenge those rulings here.

## II. Discussion

In this Court, the Commission presents two principal issues. First, it argues that the evidence conclusively establishes its entitlement to the good-faith defense under section 89.045 and, alternatively, that the trial court erred in failing to submit a jury question on the defense. Second, as an alternative argument in the event the Court concludes that section 89.045 bars Gulf Energy's tort damages but not its contract damages, the Commission contends that the trial court erred in ruling as a matter of law that a binding contract was in effect when the well was plugged and in refusing to submit that issue to the jury. We address these issues in turn.

### A. Good–Faith Defense

#### 1. Preliminary Issues

To reiterate, under section 89.045 "[t]he commission and its employees and agents, the operator, and the nonoperator are not liable for any damages that may occur as a result of acts done or omitted to be done by them or each of them in a good-faith effort to carry out this chapter." Tex. Nat. Res. Code § 89.045. No findings were made about this defense because the trial court refused to submit it to the jury.

■ As an initial matter, Gulf Energy argues that the legislative resolution granting it permission to sue precludes the Commission from invoking section 89.045. We disagree. As required by statute, the resolution did not waive any defense of law or fact "except the defense of immunity from suit without legislative permission." Tex. Civ. Prac. & Rem. Code § 107.002(a)(7)–(8). The Commission's immunity from suit is a jurisdictional component of its sovereign immunity and exists

under common law unless expressly waived by statute. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015). By contrast, section 89.045 applies to both the Commission and private entities that qualify as operators or nonoperators and provides a statutory affirmative defense to liability for those entities' "good-faith effort[s] to carry out this chapter." [11] Tex. Nat. Res. Code § 89.045; *see Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155–56 (Tex.2015) (defining "affirmative defense" as a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." (quoting Black's Law Dictionary 509 (10th ed. 2009))). This statutory defense is distinct from and independent of the Commission's common-law immunity from suit. The resolution, by its terms and by statutory mandate, did not waive the good-faith defense.

■ Gulf Energy next argues section 89.045's good-faith defense "applies only to acts that involve discretion," like policy decisions, and does not extend to the ministerial act of plugging the wrong well. In making this argument, Gulf Energy ignores the statute's language and cites case law regarding an inapplicable doctrine. Section 89.045's language is broad, foreclosing liability for "any damages" resulting from acts or omissions "in a good-faith effort to carry out" chapter 89. The only limitation on the acts or omissions that qualify is the "good-faith effort" requirement. Construing the statute to apply only to discretionary acts would require us to impermissibly limit the defense's application in a manner that contravenes the statute's plain language and thus flouts

---

11. The Commission does not dispute that it had the burden to plead and prove section 89.045 as an affirmative defense.

legislative intent. *See Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 872 (Tex.2014) (rejecting a party's interpretation of a statute that "impermissibly adds language and alters the statute's plain meaning").

To support its argument, Gulf Energy cites case law regarding the affirmative defense of official immunity, which shields government officials from personal liability for discretionary acts in good faith and within the scope of their authority. *E.g., Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424 (Tex.2004). Official immunity is a common-law doctrine, a specific element of which is that the act for which immunity is sought be in the performance of a discretionary duty. *Id.* It has no bearing on our interpretation of an independent, unrelated statute that places no such limitation on the acts and omissions to which it applies. Accordingly, we reject Gulf Energy's argument that section 89.045 cannot apply to the Commission's erroneous plugging of well 708S–5.

### 2. Defining and Applying Good–Faith Defense

On section 89.045's application to the facts at hand, the Commission argues that the trial evidence conclusively established that the Commission acted in good faith or, at the very least, the trial court erred in failing to submit a good-faith jury question. To properly apply the good-faith defense, we must first examine the parties' dispute as to what "good faith" means. Again, section 89.045 provides a defense to liability "for any damages that may occur as a result of acts done or omitted to be done by [the Commission] in a good-faith effort to carry out this chapter." Tex. Nat. Res. Code § 89.045. The statute does not define "good faith" or "good-faith effort."[12] The Commission argues that the term is subjective, reflecting "an honest or genuine effort to accomplish the task at hand, as opposed to a sham effort or an effort to achieve a different result." The Commission contends that the evidence conclusively establishes the honest and inadvertent nature of its misidentification of well 708S–5, foreclosing its liability to Gulf Energy.[13] Gulf Energy responds that good faith under section 89.045 should be measured by an objective standard and that the Commission failed to meet that standard.[14]

12. The term "good faith claim" is defined in chapter 89 as "a factually supported claim based on a recognized legal theory to a continuing possessory right in a mineral estate." Tex. Nat. Res. Code § 89.002(a)(11). That term is used only once in the chapter—one of the requirements for an application to extend the operator's deadline to plug an inactive well is the inclusion of "a statement that the operator has, and on request will provide evidence of a good faith claim to a continuing right to operate the well." *Id.* § 89.023(a)(2).

13. We disagree with the court of appeals' holding that the Commission inadequately briefed the issue in that court by failing to cite the relevant portions of the record. 480 S.W.3d at 586. The statement of facts in the Commission's brief cited Zambrano's testimony about his transposition error and noted the undisputed fact that the boat crew members thought they were plugging the 707S–5. The Commission was not required to repeat those cites in the argument section in order to preserve error. *City of Arlington v. State Farm Lloyds*, 145 S.W.3d 165, 167 (Tex.2004) (per curiam).

14. Gulf Energy argues that the Commission waived its argument for a purely subjective definition of good faith by adopting Superior's proposed definition of the term, which included an objective component. However, this argument mischaracterizes the record. At the charge conference, the Commission objected to the absence of a good-faith question and adopted Superior's similar objection. The Commission did not purport to adopt the question and instruction on good faith that Superior submitted. Rather, the Commission submitted its own good-faith question that did not define the term.

■ An undefined statutory term is given its ordinary meaning unless "a different or more precise definition is apparent from the term's use in the context of the statute." *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex.2011). Webster's defines good faith as "a state of mind indicating honesty and lawfulness of purpose"; "belief in one's legal title or right"; "belief that one's conduct is not unconscionable or that known circumstances do not require further investigation"; and "absence of fraud, deceit, collusion, or gross negligence." WEBSTER'S THIRD NEW INT'L DICTIONARY 978 (2002). None of these definitions incorporates an objective reasonableness standard. Black's Law Dictionary defines good faith as a "state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." BLACK'S LAW DICTIONARY 808 (10th ed.2009). Only one of these four definitions references a reasonableness standard, and it is essentially identical to one of the Uniform Commercial Code's statutory definitions of the term. *See* TEX. BUS. & COM. CODE § 1.201(b)(20) (defining good faith to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing").[15]

■ These definitions focus overwhelmingly on subjective state of mind and are consistent with our interpretation of the term in an unrelated context. In *Associated Indemnity Corp. v. CAT Contracting, Inc.*, we examined a surety agreement that required indemnity for claims settled by the surety in good faith. 964 S.W.2d 276,

282–83 (Tex.1998). We held that "good faith" in the surety agreement

refers to conduct which is honest in fact, free of improper motive or wilful ignorance of the facts at hand. It does not require proof of a "reasonable" investigation by the surety. Stating the proposition conversely ..., "bad faith" means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or wilful ignorance of the facts.

*Id.* at 285. We believe the term "good faith" in section 89.045 refers to similar conduct. Had the Legislature intended to place an objective limitation on the term in contravention of its ordinary meaning, it could have done so. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 74.351(*l*) (requiring trial court to grant a motion challenging the adequacy of an expert report under the Texas Medical Liability Act if the report "does not represent an objective good faith effort to comply" with the statute).

As the Commission argues, the absence of an "objective reasonableness" component makes sense for two reasons. First, if the Commission's actions must simply be objectively reasonable to qualify as a good-faith effort to comply with chapter 89, then the good-faith defense merely duplicates the negligence standard and serves no purpose. *See Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 290 (Tex.2010) (holding that statutes of repose that could be tolled or deferred would serve no purpose and that allowing tolling would equate statutes of repose with statutes of limitations); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 655 (Tex.1994) (noting in the official-immunity context that good faith serves no purpose if it is equivalent to a negligence standard).

---

**15.** Chapter 5 of the UCC, which governs letters of credit, defines good faith for purposes of that chapter in subjective terms as "honesty in fact in the conduct or transaction concerned." TEX. BUS. & COM. CODE § 5.102(a)(7).

Second, we disagree with Gulf Energy's suggestion that we import the good-faith element of the official-immunity defense into section 89.045. As noted, that defense immunizes government employees from claims "arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Chambers*, 883 S.W.2d at 653. An employee acts in good faith for official-immunity purposes if "a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Ballantyne*, 144 S.W.3d at 426. This modified objective standard makes sense in the context of reviewing an official's performance of discretionary functions, which "involve[ ] personal deliberation, decision and judgment." *Chambers*, 883 S.W.2d at 654. But as discussed above and unlike in the official-immunity context, section 89.045 is not limited to discretionary acts. For example, at oral argument, the parties discussed "all the things that can happen when you're out there trying to plug a well" that do not involve the exercise of discretion, from a slip and fall to a vehicle collision to an accident involving a tool. When that type of conduct causes damage, the question of whether a reasonable official could have believed the conduct was justified simply has no place.

Accordingly, we hold that a good-faith effort to carry out chapter 89 requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand. Applying that standard, we cannot say that the evidence conclusively establishes the Commission's good faith. While nothing indicates that Zambrano's original transcription error was anything more than a negligent oversight, Gulf Energy presented trial evidence that Superior's plugging crew and the Commission representative aboard the boat ignored obvious indicators that they were at the wrong well when the 708S–5 was plugged.

As noted, when the May 19 meeting took place, Superior was already in the process of plugging eight of the offshore wells that were the subject of the Commission's plugging order. Zambrano was the Commission representative aboard Superior's boat and had prepared a binder with the plugging procedure sheets arranged in the sequence in which the wells were to be plugged. Sometime after the meeting, Zambrano was told not to plug four wells, including the 708S–5, and removed the procedure sheets for those wells from the binder.[16] On or about May 23, Gene Reed replaced Zambrano as the Commission representative on the boat, and Zambrano explained to Reed that four procedure sheets had been removed from the binder due to the instruction not to plug those wells. This was Reed's first experience on an offshore-plugging operation.

On May 24, the boat reached the coordinates listed on the procedure sheet for the 707S–5, and, although several wells were visible from that location, the coordinates had led the crew to open water. Reed called Zambrano, who told him to look at the photographs Zambrano had taken in order to confirm which well to approach.

---

16. On May 21, Superior forwarded to Zambrano a communication from Fugro Chance indicating some confusion regarding the location of the 707S–5 and 708S–5 because the coordinates Fugro Chance had been given did not plot to the proper state tract. Zambrano then "checked the coordinates [in the plugging procedures] compared to the locations they were at" and "compared the photographs of wells as [the Commission] had them labeled … to the pictures Fugro Chance had of the wells." But the documents Zambrano turned to for clarification were the unknown source of the error.

Unfortunately, those were the same photographs Zambrano had previously mislabeled along with the procedure sheets. Based on those photographs, Reed and the crew approached the 708S–5 believing that it was the 707S–5.

By itself, we cannot say that this is willful ignorance of the facts at hand. However, two more red flags emerged before the well was plugged calling into question whether the boat was at the correct well. First, the procedure sheets described the 707S–5 as having only a single string of tubing, but the well that the boat approached had a dual tree, raising the possibility of a second string.[17] The crew ran a slickline down the second tree and encountered an obstacle about fifteen feet down. The crew subsequently confirmed that no tubing in the second tree required plugging, but only after they had plugged the first string. Accordingly, the decision to plug the first string was made before the crew knew whether the well conformed to the procedure sheet's description. Second, when the crew ran the slickline down the first string, the well measured almost 300 feet deeper than the data reflected on the 707S–5 procedure sheet.

Zambrano and Reed gave conflicting testimony about the Commission's reaction to these discrepancies. Zambrano testified that Reed called him to discuss both matters and that neither of them affected his conclusion that the boat was at the correct well. When asked whether he had ever seen a single-string well with a dual tree, he responded, "Maybe not often, but it does happen." He also testified that he had been involved in plugging operations in which the well ran deeper than expected. He testified that, in light of this experience, he instructed Reed to proceed to plug the well.

By contrast, Reed testified that he did not speak to Zambrano about either issue. With respect to the well's having a dual tree, Reed testified:

Q So the 707S5, you remember, was the well that you were supposed to plug next and the well data that you had for that was a single completion well?

A That's correct.

Q But when you got up and set up next to the 708S5 you could see when you got close enough to the tree that it was a dual completion tree, couldn't you?

A That's correct.

Q But that didn't stop anybody from embarking on the plugging procedure for that well, did it?

A No, sir.

Q And you have no memory of ever talking to [Zambrano] about that disparity from the well data for the well that you meant to be on because you'd already decided, based on the picture, to plug that well; right?

A Yes, sir.

Reed also testified about the well's unexpected depth:

Q You went deeper by almost 300 feet from what the well data for the 707S5 indicated was the bottom of that well, didn't you?

A Right.

Q Okay. And you didn't call [Zambrano] about that. You had already decided, because of the picture, you had had enough conversation, that's the well you were going to plug; right?

A I don't remember calling him, no, sir.

Based on this evidence, we cannot say as a matter of law that the Commission acted in good faith. On the one hand, the jury

---

17. The 708S–5 is described in the Commission's records as a dual-completion well.

could reasonably infer that the Commission's representatives considered the facts and decided that the boat was at the correct well. On the other hand, the jury could also reasonably infer that, once Reed determined that the well visually matched the picture, he willfully ignored the discrepancies between the well data and the well itself in addition to the potential consequence of those discrepancies. Accordingly, we hold that a fact issue exists as to whether Gulf Energy's damages resulted from acts of the Commission that were conducted in a good-faith effort to carry out chapter 89.[18] TEX. NAT. RES. CODE § 89.045.

### 3. Waiver and Harm

█ Because a fact issue exists on the Commission's good faith, we may not render judgment in its favor. However, the Commission requested and was entitled to a jury question on this defense, and the trial court erred in failing to submit it. TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions and definitions ... which are raised by the written pleadings and the evidence.").

█ Gulf Energy argues the Commission waived any error relating to the trial court's refusal of its proposed good-faith question by failing to request a definition of good faith in conjunction with the question. We disagree. The procedural rules governing jury charges state in pertinent part that "[f]ailure to submit a question may not be deemed a ground for reversal

of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment." TEX. R. CIV. P. 278.[19] Generally, a question on a statutory cause of action or defense "should track the language of the provision as closely as possible." *Borneman v. Steak & Ale of Tex., Inc.,* 22 S.W.3d 411, 413 (Tex.2000) (citations and internal quotation marks omitted).

Gulf Energy does not dispute that the Commission's proposed good-faith question generally tracked the pertinent statutory language. The Commission complied with Rule 278 and did not waive the trial court's error in refusing to submit that question by failing to request an accompanying extra-statutory definition. We are particularly loath to find waiver for failing to propose a definition of a statutory term when no case law provided explicit guidance on what the proper definition of that term should be.

█ Because the trial court's error was not waived, we must consider whether it is reversible. TEX. R. APP. P. 61.1 (trial court's error is not reversible unless it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts"). Charge error "is generally considered harmful" and thus reversible "if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284

---

18. At oral argument, Gulf Energy contended that, in postponing plugging the 708S–5, the Commission was attempting to conserve the cleanup fund established under Natural Resources Code chapter 81 and that the Commission thus was not carrying out chapter 89 (in good faith or otherwise) when it erroneously plugged that well. We disagree. When it plugged the 708S–5, the Commission was doing exactly what chapter 89 authorized it to do: plugging inactive wells whose operator

was financially insolvent. *See* TEX. NAT. RES. CODE § 89.043. To the extent this conduct resulted in damages, section 89.045's good-faith defense was triggered.

19. Although not pertinent here, the rule continues that an objection is sufficient to preserve error "if the question is one relied upon by the opposing party." TEX. R. CIV. P. 278.

S.W.3d 851, 856 (Tex.2009). The good-faith defense qualifies as such an issue, and the trial court committed reversible error in failing to submit it to the jury. Accordingly, we reverse the court of appeals' judgment.

### B. Contract Claim

#### 1. Contract Formation

The Commission's remaining issues concern the jury's finding that the Commission breached its contract with Gulf Energy in light of the Commission's assertion that a binding contract did not exist when the breach occurred. The parties' specific dispute is whether Gulf Energy and the Commission entered into a binding contract on May 19, 2008—the date of the meeting between representatives of Gulf Energy, the Commission, and ACE—even though a formal written agreement was not signed by all parties until June 9. The Commission argues they did not, and that it could not have breached the contract by plugging the well on May 25 because no contract existed at that time. The Commission contends that a fact issue exists as to when the contract was formed and that the trial court erred in failing to submit that issue to the jury.

The court of appeals held that the Commission waived this complaint, concluding that the Commission "did not object at trial to question one [the breach-of-contract question] on the basis it complains of on appeal." 480 S.W.3d at 576. We disagree. Question one asked the jury: "Did the Railroad Commission fail to comply with its agreement to postpone plugging and abandoning the 708S–5?" At the charge conference, the Commission objected "to the failure to have a formation question with regard to the contract," arguing:

With the way [the question] is submitted now, it will allow a breach of contract prior to the meeting of the minds, which is antithetical to the law of breach of contract because it is vague and because also question one, the way it is worded, does not tie in when the actual agreement was reached and when the breach may have occurred....

In the court of appeals, the Commission argued that the trial court "erred by instructing the jury that there was a legally binding contract between the Railroad Commission and Gulf Energy on May 19, 2008," and that the submitted question "erroneously assumes that the Railroad Commission entered into a legally-enforceable agreement to postpone plugging the well on May 19, 2008." The Commission further argued that, assuming the parties entered into a valid contract, "it was not formed until June 9, so nobody breached the June 9 contract by plugging the well on May 26."

We agree with the Commission that its objection to the contract question and its argument in the court of appeals are similar in substance. The Commission contended both at the charge conference and on appeal that the May 19 agreement was not binding and that the issue of contract formation should have been submitted to the jury. The court of appeals erred in holding that the Commission waived its charge-error complaint on the contract question.

Turning to the merits, our analysis is governed by *Foreca, S.A. v. GRD Development Co.*, in which we addressed the "increasingly common [situation] in business negotiations" in which an "[a]greement was reached as to certain material terms, yet another formal document was contemplated by the parties." 758 S.W.2d 744, 745 (Tex.1988). We considered whether "the contemplated formal document [was] a condition precedent to

the formation of a contract or merely a memorial of an already enforceable contract."[20] *Id.* The answer depends on the intent of the parties, which is usually a question for the trier of fact. *Id.* at 746 (citing *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 557 (Tex.1972)). The documents evidencing the alleged agreement in *Foreca* stated that they were "subject to legal documentation contract to be drafted by [one party's attorney]." *Id.* at 745. We held that such language was not conclusive, that the evidence was disputed as to the parties' intent to be bound before "execution of the contemplated legal documentation," and that the issue was properly submitted to the jury. *Id.* at 746; *see also Martin v. Black,* 909 S.W.2d 192, 197 (Tex.App.–Houston [14th Dist.] 1995, writ denied) (holding that the parties' briefing on a motion to enforce a mediated settlement agreement "reflect[ed] a dispute on whether the parties intended the term sheets to be the 'final agreement merely memorialized by a formal document'").

By contrast, in *Hardman v. Dault,* the court of appeals held as a matter of law that a memorandum outlining the essential terms of a mediated settlement was a binding contract as opposed to a tentative agreement to agree, even though one of the provisions stated that "[f]inal documents [were] to be signed by" a particular date. 2 S.W.3d 378, 380–81 (Tex.App.–San Antonio 1999, no pet.). The court explained that the provision did not contain any "subject to" language or otherwise indicate that signing the subsequent documents was a condition precedent to the formation of an enforceable contract. *Id.* at 381.

In this case, the evidence is conflicting as to whether the Commission and Gulf Energy intended to be bound by the oral agreement reached at the May 19 meeting, or whether the formal Forbearance and Settlement Agreement subsequently signed by the parties was necessary for the formation of a binding contract. The following evidence is relevant to this issue:

- Sheila Weigand, a Commission employee who attended the meeting, testified that the Commission agreed in the meeting to postpone plugging four wells (including the 708S–5) to give Gulf Energy an opportunity to get approval from the ACE bankruptcy judge and to obtain an order from the Commission superseding the plugging order as to those wells. Ms. Weigand was then asked whether there would be any justification for the Commission to plug those wells "contrary to the agreement they just made," and she responded, "No."

- Lowell Williams, the supervisor of the enforcement section of the Commission's office of general counsel, also attended the meeting and ultimately signed the written agreement on the Commission's behalf. Mr. Williams testified: "I don't think anything had been agreed to in that meeting other than we would look at—the Railroad Commission being 'we'—would look at and try to determine whether or not it was possible that we could delay our operations and whether we wanted to delay our operations in proceeding to carry out the terms of the [plugging] order." Mr. Williams also testified that "there was some confusion" at the meeting "as to what particular wells" Gulf Energy wanted to take over and

---

**20.** This is a related but distinct issue from whether an agreement is not binding because it "leaves material matters open for future adjustment and agreement that never occur." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex.2000).

that, when he left the meeting, he "didn't have a clear understanding of what wells were involved."

- In an e-mail exchange the day after the meeting among its participants, Hal Morris, an assistant attorney general in the bankruptcy division, wrote that the purpose of the e-mail was "to endeavor to memorialize our agreement reached yesterday." Included in the email was a "FIRST ROUGH DRAFT" of the agreement. Morris also stated in the e-mail that "[a]s time is of the essence, I am sending this to EVERYONE and thus must respectfully reserve the right for the [Commission], who has not previously been furnished this writing, with the ability to make suggested changes."
- ACE's attorney also sent an e-mail "to confirm the key terms of the settlement/compromise negotiated" between the Commission and ACE.
- Several drafts of the agreement were e-mailed in the days following the meeting, confirming among other things the particular wells that would not be plugged, the amount of the bond Gulf Energy would be required to post,[21] and the date by which Gulf Energy would post the bond. The e-mails reflect a dispute between the parties on the latter term, with the Commission ultimately agreeing to allow Gulf Energy to post the bond by the date of the hearing on Gulf Energy's motion to supersede the plugging order, rather than the date the motion was to be filed.
- In a May 23 e-mail, Morris wrote: "Understandably, until I have the [Commission's] sign off, I cannot fi-

nally approve the agreement but as you know from our previous communications over the past week, [ACE] and the [Commission] have indeed reached an agreement as has been memorialized in principle in numerous emails and we are now merely at producing final documentation to submit to [the bankruptcy judge]."

- The bankruptcy court signed an agreed order approving the settlement agreement "entered into on June 9, 2008." In a later opinion, the bankruptcy court stated that ACE and the Commission "entered into a settlement" on May 19, 2008. *In re Am. Coastal Energy, Inc.*, 399 B.R. 805, 808 (Bankr.S.D.Tex.2009).
- The legislative resolution waiving the Commission's immunity from suit stated that the parties "reached a tentative settlement and forbearance agreement" on May 19, "pending approval of the commission, attorney general, and bankruptcy court."
- Bill Rhea, Gulf Energy's CEO, was asked whether he had authority from the company's board of directors "to go forward with the project" on May 19. He testified that he "had authority to participate in that meeting and see what would come of the opportunity." As to whether he had authority "to say yes we're going to take over all of those wells in that project," Mr. Rhea testified that he "had the overall approval, but [he] had to go back to the Board with specifics" and get the Board's approval "to say yes we are going to this deal." Later, Mr. Rhea testified inconsistently that, before going into the meeting, he "received authority

---

21. Gulf Energy deposited $400,000 with the Commission as security when it applied to take over operation of the four wells. After

discovering that the 708S–5 had been plugged, Gulf Energy sought and received a $100,000 refund from the Commission.

from the Board to make the agreement that [he] made that day."

- In a memorandum to Gulf Energy's board of directors prepared two days after the meeting, Mr. Rhea wrote that he "met Monday with ACE, the [Commission], and the State Attorney General's office in a bid to postpone further abandonment and allow for some time for [Gulf Energy] to assess the opportunity, undertake due diligence, and seek approval from the Company's Board to proceed."

In light of this evidence, we agree with the Commission that whether the parties intended to be legally bound on May 19 is a disputed fact issue that should have been presented to the jury. Some portions of the e-mails and testimony described above support Gulf Energy's position that the formal Settlement and Forbearance Agreement was "merely a memorial of an already enforceable contract." *Foreca*, 758 S.W.2d at 745. Others support the Commission's position that the parties did not intend to be legally bound absent a negotiated formal document. *Id.* The question of the parties' intent to be bound is usually one of fact, and we cannot say that this case presents the unusual situation in which that question may be decided as a matter of law.

Accordingly, we hold that the trial court erred in resolving the contract-formation issue as a matter of law. Whether the Commission's conduct in plugging the well on May 25 constituted a breach of contract depends on whether the parties had entered into a binding contract at that time. *See David J. Sacks, PC v. Haden*, 266 S.W.3d 447, 450 (Tex.2008) ("A meeting of the minds is necessary to form a binding contract."). On remand, the Commission is entitled to have this disputed issue of material fact resolved by the jury.

## 2. Application of Good–Faith Defense to Contract Claim

 Because we are remanding for a new trial, we address an additional dispute between the parties on the good-faith defense's application to Gulf Energy's contract claim. The Commission argues that, because section 89.045 protects the Commission from liability for *any* damages resulting from the Commission's good-faith efforts to carry out chapter 89, the defense is not limited to tort liability and limits Gulf Energy's ability to recover on the contract claim as well. Gulf Energy counters that good faith is irrelevant in a breach-of-contract context.[22]

The Commission does not dispute that bad faith is not an element of a breach-of-contract claim and that a party generally may be liable for breach of contract regardless of whether the breach was intentional or inadvertent. However, section 89.045 does not tie the good-faith defense to a specific cause of action or category of claims. Rather, it applies broadly to "any damages" resulting from "acts done or omitted to be done by [the Commission] in a good-faith effort to carry out this chapter." TEX. NAT. RES. CODE § 89.045. Had the Legislature intended to apply the defense to a particular claim or class of claims, it could have done so. Instead, the Legislature determined that the policies underlying chapter 89—protection of Texas's water and land through the plugging

---

**22.** Gulf Energy argues that the Commission failed to preserve section 89.045 as a defense to the contract claim because, in the trial court and court of appeals, the Commission pled and argued the statute only as a defense to the negligence claim. Because charge error necessitates a new trial on both claims, we address the issue of whether the defense applies to the contract claim to provide clarity to the parties and the trial court.

**576**

of abandoned wells—warranted a defense to liability for entities that are carrying out those policies in good faith. *See id.* §§ 89.001, .045. Limiting the defense's reach in the manner Gulf Energy suggests would require us to rewrite the statute. Accordingly, we hold that the good-faith defense is not limited to tort actions.

### III. Conclusion

We hold that the trial court erred in (1) failing to submit a jury question on section 89.045's good-faith defense and (2) failing to submit a jury question on contract formation. We reverse the court of appeals' judgment and remand the case for a new trial.