Evelyn V. Keyes, Justice
The appellees and cross-appellants, Chalker Energy Partners III, LLC; Raptor Petroleum, LLC; BMW Investments, L.P.; Ark-La-Tex Property Investments, LP; Remora Oil & Gas, LLC; Eastern Redbud, LLC; Jimmy Sutton; Vicenergy, LLC; Chris Faulker d/b/a Terro Geological, LLC; Jerry Caylor; Larry Caylor; John Talley; Erickson Resources, LLC; John G. Kremer, Trustee for the 1st Amendment to the Richard E. and Betty V. Kremer Living Trust Dated 1/3/2002;
*31 M&D Exploration, LLC; Joe D. Nobles; R. Byron Roach, Trustee, LLC; and Russell L. Roach (collectively, "the Sellers"), sought to sell valuable oil and gas interests located in the Texas panhandle. Appellant and cross-appellee, Le Norman Operating LLC ("LNO"), was a potential purchaser of those assets. Following a competitive bid process and other negotiations, LNO believed that it had entered into a binding agreement to purchase a portion of the Sellers' oil and gas interests; however, the Sellers ultimately sold the interests to a third party, Jones Energy.[1]
LNO filed a breach of contract suit against the Sellers, who counter-claimed, asserting their own breach of contract claim and also asserting claims for declaratory judgment, attorney's fees, and sanctions. After considering numerous summary judgment motions filed by the parties, the trial court granted partial summary judgment in favor the Sellers and dismissed LNO's breach of contract claim against them. The trial court also granted LNO's summary judgment motion seeking dismissal of all of the Sellers' counter-claims.
In three issues on appeal, LNO challenges the grounds on which the trial court granted summary judgment on its breach of contract claim, asserting that: (1) it presented evidence raising genuine issues of material fact regarding whether the parties had formed a contract; (2) the trial court erred in granting summary judgment under the Uniform Electronic Transactions Act (the "UETA") based on its conclusions that the parties did not agree to conduct business electronically and that the alleged contract did not contain a valid electronic signature; and (3) it presented evidence raising genuine issues of material fact regarding whether the alleged contract was illusory.
On cross-appeal, the Sellers also assert three issues, arguing that: (1) the trial court erred in rendering a take-nothing summary judgment on their breach of contract claims; (2) LNO was not entitled to summary judgment on the Sellers' counter-claims for declaratory relief and related attorney's fees; and (3) the trial court erred by failing to award costs to them as prevailing parties as required by Texas Rule of Civil Procedure 131.
We affirm in part and reverse and remand in part.
Background
A. The Sellers Developed and Sought to Sell the Kitty Stroker Assets
The Sellers each acquired independent working interests in various oil and gas leases located in the Texas panhandle ("the Kitty Stroker Assets" or "Assets"). The Sellers entered into a Development Agreement to develop among themselves and eventually sell their interests in the Kitty Stroker Assets.
In 2012, the Sellers had completed their intended development of the Assets and were ready to sell. They engaged financial services firm Raymond James to conduct the sale process. Pursuant to their Development Agreement, the Sellers also agreed that Chalker Energy Partners ("Chalker Energy") would function as the Sellers' "designated agent" in conducting the sale. One of the Sellers, Remora, monitored the sales effort and reported events to the other Sellers. The Sellers entered into the "Chalker Engagement Agreement," which set out the process by which *32 potential sales of the Kitty Stroker Assets would be considered.
B. LNO Engaged in Negotiations with the Sellers
In August 2012, Chris Simon, the head of asset acquisitions and divestitures at Raymond James and the employee overseeing the sale of the Kitty Stroker Assets, sent an e-mail to potential buyers announcing the sale of the Assets and instructing interested parties to direct all inquiries regarding the sale to him. LNO, a company that owns and operates oil and gas properties in Texas and Oklahoma, received this e-mail and decided to engage in the bidding process.
On September 27, 2012, Simon e-mailed David Le Norman, the principal of LNO, directly with additional information regarding the sale of the Assets. This e-mail asserted that the "Data Room," containing files of detailed information about the Assets, would be available on October 3, 2012, and that bids were due November 1, 2012. Attached to this e-mail were an "Information Memorandum" and a confidentiality agreement.
On September 30, 2012, Le Norman, on behalf of LNO, and Bill Dukes, on behalf of Chalker Energy, signed the confidentiality agreement ("Confidentiality Agreement") so that LNO could view the materials in the Data Room and participate in the bid process. LNO agreed to limit its use and disclosure of certain confidential information provided by Chalker Energy to "the evaluation and the possible acquisition by [LNO] of [the Assets]."
In relevant part, section 18 of the Confidentiality Agreement provided:
No Obligation. The Parties hereto understand that unless and until a definitive agreement has been executed and delivered, no contract or agreement providing for a transaction between the Parties shall be deemed to exist and neither Party will be under any legal obligation of any kind whatsoever with respect to such transaction by virtue of this or any written or oral expression thereof, except, in the case of this Agreement, for the matters specially agreed to herein. For purposes of this Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement or offer, unless specifically so designated in writing and executed by both Parties.
It further stated that Chalker Energy
reserves the right, in its sole discretion, to: ... (c) discontinue consideration of a transaction at any time; (d) reject any and all proposals made by any party with regard to a transaction; (e) terminate discussions and negotiations with [LNO] or any party at any time for any reason; and (f) conduct the process relating to a possible transaction in any manner it deems appropriate or change the procedure for conducting that process.
Finally, the Confidentiality Agreement provided that the parties agreed to waive consequential damages: "Neither party shall be liable to the other party hereunder for any special, indirect, incidental, consequential, punitive or exemplary damages of any kind or character, including lost profits or loss of business opportunity ... arising out of this agreement."
In October 2012, Le Norman attended what the parties call "the Data Room Presentation," a slide presentation created by Raymond James regarding the use of the virtual data room, which was a virtual file room where detailed information on the Kitty Stroker Assets-including maps, legal descriptions, production projections, and a form Purchase and Sale Agreement *33 ("PSA")-was available for potential buyers to review. The Data Room Presentation was prepared "solely for informational purposes," and the presentation included a slide describing the bid procedure. Consistent with the Chalker Engagement Agreement among the Sellers, this slide provided that once Chalker Energy received bids, each Seller "shall be given 24 hours to elect to sell their interest once the purchase price has been determined." It further provided, "Upon the negotiation of the PSA, each [Seller] shall be given 48 hours to elect to accept the terms of the PSA and execute the appropriate documents."
The Data Room Presentation also contained a disclaimer stating that "[b]y accepting this Presentation, the recipient acknowledges and agrees that" the information contained in the Presentation is confidential, that it will not reproduce the Presentation, and that it will return the materials to Raymond James as soon as practical if it does not wish to pursue the sale further. The disclaimer further stated,
[Chalker Energy] reserves the right to negotiate with one or more prospective parties at any time and to enter into a definitive agreement for a transaction without prior notice to you or to other prospective parties. [Chalker Energy] also reserves the right to terminate, at any time, further participation in the due diligence and proposal process by any party and to modify any procedures without providing any reason therefore. [Chalker Energy] intends to conduct its business in the ordinary manner during the evaluation and offer period; however, [it] reserves the right to take any action, whether in or out of the ordinary course of business, which in its sole discretion it deems necessary or prudent in the conduct of such business.
LNO also received two "Confidential Bid Instruction" letters, dated October 19, 2012, and October 31, 2012. The letters provided additional information about the bid process and set out a deadline of November 5, 2012, for parties to submit their bids to purchase the Assets. The letters stated that "[a] scanned document delivered via e-mail is the preferred delivery method" and set out the format in which bids should be submitted. The letters stated that the offer should include, among other things, a "proposed amount and type of consideration to be paid" to the Sellers, a "description of the financial arrangement to be used to consummate the proposed transaction," the "[t]iming of the transaction including the expected date for the signing of a definitive agreement and the anticipated closing date of the transaction," and "[a] marked copy of the PSA previously provided in the Virtual Data Room ... indicating additions or deletions you would propose and on which you would be willing to execute a definitive agreement." The bid instructions reiterated that each Seller would be given 24 hours to elect to sell their interests upon receipt of an offer forwarded by Chalker Energy. A bidder could then adjust its bid in light of the Sellers' elections, and Chalker Energy would negotiate a definitive purchase agreement with the selected party. Each Seller would then be given 48 hours to elect to accept the terms of the PSA and execute the appropriate documents. The letters also included a "Bid Form" for bidding parties to use in making their bids.
The Data Room Presentation slide show and the two confidential bid instruction letters comprise the documents that governed the bidding process ("the Bid Documents").
LNO submitted a bid via e-mail on November 5, 2012, offering $322 million for 100% of the Assets. This bid stated that it *34 was made "subject to the execution of a mutually acceptable Purchase and Sale Agreement ('PSA') between the parties for the sale of the Assets." LNO also included a copy of the form PSA from the virtual data room with redlined changes that Remora and Chalker Energy both indicated were insignificant.
Upon receipt of the first round of bids, Raymond James asked the two highest bidders, LNO and Jones Energy, to increase their bids and set a deadline of November 9, 2012, for submitting the revised bids. LNO revised its bid to offer $345 for 100% of the Assets, again expressly referring to the bid instructions and including a proposed PSA based on the form provided by the Sellers in the virtual data room.
Pursuant to the bid procedure set out in the Bid Documents, Chalker Energy selected LNO's bid to present to the other working interest owners and gave them 24 hours to respond. When the elections submitted by the working interest owners indicated that the Sellers were only willing to provide 82% of the Assets subject to a reversionary interest, negotiations with LNO continued, and the parties made several offers and counter-offers. These negotiations were ultimately unsuccessful. On November 14, 2012, Le Norman, on behalf of LNO, informed Chalker Energy via e-mail that it would no longer pursue the transaction, stating, "After considerable thought and effort on the part of myself an[d] staff, we can no longer pursue the ... transaction as altered by the Sellers." However, LNO left open the possibility that, although the deal had "changed materially," some agreement might be reached in the future.
On November 19, 2012, in response to a new offer from the Sellers for a smaller percentage of the Kitty Stroker Assets, Le Norman, on behalf of LNO, sent an e-mail to Simon at Raymond James proposing new deal terms. The e-mail subject line stated, "RE: Counter Proposal." It listed seven specific terms:
1 $230 M for 67% of the 8/8ths RJ supplied database property set
2 Eff date same at 9 1 12
3 Execution of the PSA on or before 11 20 12, closing on or before 12 31 12
4 Non-compete for ALL owners for one year with two mile halo around any unit being sold
5 PSA similar to what we returned with the above caveats
6 Our interest is not subject to the development agreement
7 All parties staying in will execute JOA, it will be attached to the PSA
Le Norman stated in the e-mail that LNO had "limited time to run [its] processes and need[s] to know if this is accepted." Unlike LNO's previous bids, the e-mail did not make any reference to the bid procedure and concluded,
We will not be modifying or accepting any changes to the base deal described above and don't want to be jerked around anymore. We will give you [until] 5:00 pm CST tomorrow to accept. Best we can do and you hopefully understand I have recommended to my Board to pass if the timeline is not met or a counter proposal is sent. Good luck. Dave
Bill Dukes, the vice president of land and business development for Chalker Energy, sent each of the Sellers a bid recommendation and ballot regarding the sale to LNO based on the terms proposed in the November 19, 2012 e-mail. The bid recommendation set out the material terms of the agreement as expressed in LNO's November 19 e-mail and stated, "Chalker is recommending that we move forward with a sale of the Assets to Le Norman based *35 on this offer[.]" Chalker Energy's recommendation further stated,
Pursuant to Paragraph 7 of the Chalker Engagement Agreement, you have twenty four (24) hours from your receipt of this recommendation to make a written election to participate in the sale of the your interest in the Assets (the "Transaction")[.] However, the offer received from Le Norman has a deadline for response of today at 5 00PM CST, so we ask for your immediate attention to this election notice and a response by no later than 4 00PM today, Tuesday, November 20, 2012 .
(Emphasis in original).
The Sellers returned their written ballots indicating that they elected to participate in the sale to LNO. For example, the record contains the written election of Seller Ark-La-Tex Property Investments, stating, "I elect to participate in the Transaction based on the bid recommendation presented and will sell my interest as reflected on the conversion spreadsheet attached to this election notice." The record contains nearly identical elections from the other Sellers as well, many of which were transmitted through electronic means. During the process of collecting the Sellers' written elections, Simon and Dukes communicated with each other via e-mail regarding contacting the various Sellers. At 2:37 p.m. on November 20, Dukes sent an e-mail with the subject line "Have called everyone" and listed ten Sellers who were, at that time, "[c]onfirmed to sell." He also listed some other owners who still needed more information or additional time.
Based on the elections eventually received from the Sellers, Simon replied to LNO's e-mail on November 20, 2012. He stated, "We have the group on board to deliver 67% subject to a mutually agreeable PSA. We are calling to discuss next steps and timing. Chalker et al. will be turning a PSA tonight to respond to your last draft. Please give me a call to discuss schedule and timing."
Later on November 20, 2012, Dukes sent an e-mail to the Sellers, stating,
Thanks to you all for responding in such a timely manner today. We notified Le Norman prior to the 5:00 pm deadline that we had the 67% interest committed to sell and are on board for moving forward with finalizing the PSA and the additional documents associated with the Transaction. My understanding is we will be providing you with your final interest being sold (and retained if applicable) tomorrow, which will be based on the elections you made today. Due to the [Thanksgiving] holiday we are not sure of the timing of our follow-up negotiations but we will be providing PSA comments back to Le Norman tomorrow and coordinating our go forward schedule. Please continue to monitor your email for updates and/or any requests that may be necessary to complete the preparation of agreements for the sale.
Although LNO and the Sellers had exchanged draft PSAs during previous negotiations, the parties still needed to complete key exhibits to the PSA, including escrow agreements, a non-compete agreement, and a joint operating agreement. The parties continued to work toward finalizing the PSA. However, LNO presented deposition testimony of at least one Seller, John Talley, who testified in his deposition that, on November 20, 2012, it was his intention to sell his interest in the Assets to LNO. Various e-mails continued to pass between the parties, including an e-mail from Chalker Energy to LNO discussing the Assets and referring to them as "what is being sold to Le Norman."
The record contains an e-mail from a representative of Remora congratulating *36 one of LNO's private equity investors on "winning the bid," stating, "[LNO] is going to do great with our [Assets]." Chalker Energy e-mailed spreadsheets detailing the "interest being sold for each area," and stating that "each area delivers a 67% WI to the buyer." At 5:53 p.m. on November 21, Chalker Energy e-mailed LNO an updated draft of the PSA and stated that "our crew will largely be taking tomorrow and Friday off," so it would not expect to hear from LNO until the following Monday.
C. The Sellers Entered into a PSA with Jones Energy
On November 21, 2012, the day after the Sellers elected to accept LNO's November 19 offer and Dukes sent an e-mail to the Sellers informing them that he had "notified Le Norman prior to the 5:00 pm deadline that we had the 67% interest committed to sell and are on board for moving forward with finalizing the PSA," a representative from Jones Energy e-mailed one of the Sellers, Remora, stating, "We just heard we lost the deal again." The representative of Remora responded, "I'm sorry it turned out this way. If anything changes on this end, I will be the first to let you know."
Jones Energy subsequently presented a new offer to Chalker Energy. On November 22, one Seller, Raptor, informed Chalker Energy that it would prefer to go with the new offer received from Jones Energy. Chalker Energy responded that Jones Energy's offer had benefits the "current deal cannot deliver" and prepared to "change horses."
Chalker Energy submitted ballots on November 23, 2012, to the rest of the Sellers to determine whether they were willing to negotiate a sale of the Kitty Stroker Assets to Jones Energy. The Sellers responded in the affirmative, and Chalker Energy and Jones Energy negotiated the final PSA terms. On November 27, 2012, the Sellers received a finalized PSA to review and execute.
The Sellers and Jones Energy finalized and executed their PSA on November 28, 2012. The same day, LNO likewise delivered a PSA to Chalker Energy. Upon learning of the deal between the Sellers and Jones Energy, however, Le Norman, acting on behalf of LNO, sent the first of several written demands that the Sellers honor the contract they had entered into on November 19-20.
The deal between the Sellers and Jones Energy went forward. Pursuant to the Jones Energy PSA, Jones Energy placed $12.5 million in an escrow account. The sale of the Assets between Jones Energy and the Sellers closed on December 12, 2012. However, Jones Energy learned of LNO's demands that the Sellers honor their purported November 19-20 agreement and refused to release the escrowed funds according to the previously-agreed schedule, asserting that the Sellers' failure to disclose LNO's demands was a breach of the Jones Energy PSA. The Sellers objected to Jones Energy's refusal to release all of the escrowed funds on the ground that the refusal was itself a breach of the Jones Energy PSA. The Sellers also presented some evidence, including excerpts of deposition testimony by one of Jones Energy's corporate representatives, that it made the decision to withhold the escrowed funds in response to LNO's litigation against the Sellers and the threat of litigation against Jones Energy itself.
D. LNO Filed Suit Against the Sellers and the Sellers Counter-claimed
LNO filed suit against the Sellers, asserting that they had breached their agreement to sell it a 67% interest in the Kitty Stroker Assets for $230 million.
*37 LNO also filed a claim for tortious interference with a contract against Jones Energy, but it later nonsuited that claim pursuant to a settlement with Jones Energy.
The Sellers counter-claimed against LNO, seeking sanctions, declaratory relief, and damages for LNO's alleged breach of the Confidentiality Agreement and Bid Documents. They identified their damages as being the amount of funds Jones Energy refused to release from the escrow account after it learned of LNO's demand that the Sellers honor their agreement to sell the Assets to LNO and the amounts expended in attorney's fees and other costs caused by LNO's suit.
Chalker Energy, as one of the Sellers, sought declaratory relief that there was no binding agreement between it and LNO for the purchase and sale of the Assets and that the Confidentiality Agreement and other Bid Documents were in full force and effect for the negotiations occurring on November 19-20. It also asserted a breach of contract claim on the basis that LNO breached section 18 of the Confidentiality Agreement and the "Data Room Presentation" by filing its own breach of contract claim and retaining the data room materials, and it sought sanctions and attorney's fees. The other Sellers, referred to by the parties as the Raptor Parties[2] and the Roach Parties,[3] also counter-claimed, seeking sanctions and attorney's fees; asserting a breach of contract claim for LNO's material breach of the Confidentiality Agreement; and seeking declarations that LNO has no viable cause of action against Jones Energy and that the rights and obligations of the Confidentiality Agreement and other Bid Documents had not terminated, were binding on LNO, and applied to its offers to purchase the Assets.
E. The Parties Moved for Summary Judgment on Multiple Grounds
In their various motions, the Sellers advanced the theory that the formal bid process, as set out in the Bid Documents and Confidentiality Agreement, controlled all of the relevant negotiations and, thus, a formalized PSA was necessary to create a contract that was binding on them. Accordingly, the Sellers filed, among other motions for summary judgment,[4] a motion they term the "Master Motion for Summary Judgment." The Sellers argued that LNO's contract claim was barred by the statute of frauds, that no enforceable contract for the sale of the Assets existed between the parties because there was no meeting of the minds or intent to be bound, that there were failures of conditions *38 precedent, and that the alleged agreement was illusory. The Sellers also moved for summary judgment on the ground that the November 20, 2012 e-mail could not form the basis for a binding contract under the UETA because they did not agree to conduct business electronically and the e-mail lacked an electronic signature.
The parties adduced documents setting out the sequence of events recounted above, multiple e-mails, and other evidence. The summary judgment record included copies of the applicable agreements and other documents from the bid process, copies of the November 19-20 e-mail chain that forms the basis of LNO's claim that a contract to sell existed between the parties, and various other e-mails and documents evincing the parties' subsequent conduct. Additionally, the Sellers adduced evidence that a group of interested third parties who were not selling Assets but whose agreement to assign some interests in the Assets was necessary-referred to by the Sellers as the Cleveland Family-would not have consented to assign any interest in the assets to David Le Norman. In rebuttal, LNO presented evidence that the Cleveland Family had previously assigned some interests to it earlier in the month of November 2012.
LNO also moved for traditional and no-evidence summary judgment against the Sellers' counter-claims. It argued that the trial court should grant summary judgment denying the Sellers' claim that LNO breached section 18 of the Confidentiality Agreement on multiple grounds, including that section 18 constituted a condition, not a covenant that could be breached, and that the damages alleged by the Sellers-Jones Energy's retention of some of the escrow funds-were caused by an alleged breach of a separate agreement between the Sellers and Jones Energy, not LNO. LNO also asserted that the Sellers failed to present any actual evidence of the alleged damages caused by LNO's purported breach of the Confidentiality Agreement.
LNO further asserted that the trial court should grant summary judgment on the Sellers' claims that it "breached" the Data Room Presentation, as that document was prepared "solely for informational purposes" and any alleged consideration was the same as that supporting the Confidentiality Agreement, so the Data Room Presentation itself was not a separate contract. LNO also argued, in a no-evidence point, that Chalker Energy presented no evidence of its alleged damages, nor did it present evidence of any breach by LNO causing any damages. It also asserted that the trial court should grant summary judgment denying the Sellers' request for attorney's fees. Finally, LNO argued that the trial court should grant summary judgment denying the Sellers' declaratory judgment claims.
Regarding the Roach Parties' and Raptor Parties' claim seeking a declaration of Jones Energy's tort liability to LNO, LNO argued that only Jones Energy had standing to seek such relief, that the request improperly sought a declaration of non-liability for a tort, and that LNO had nonsuited any claims against Jones Energy prior to the Roach and Raptor parties' filing of this claim, so no justiciable controversy existed between LNO and Jones Energy. Regarding the remainder of the Sellers' declaratory judgment claims, LNO asserted that they should be summarily denied because they only recast issues already present in the lawsuit for the purposes of obtaining attorney's fees on those claims.
F. Trial Court's Rulings
The trial court granted the Sellers' Master Motion for Summary Judgment on *39 April 29, 2015. LNO sought clarification of the grounds upon which the motion was granted, and the trial court signed a "Clarification of Order" on November 17, 2015, identifying the specific grounds upon which it ruled. The trial court determined:
There was no meeting of the minds because the Confidentiality Agreement, the Bid Instructions, and the Data Room Presentation preclude a binding contract without an executed, delivered purchase and sale agreement, or "PSA."
....
There was no meeting of the minds because any offer and acceptance was subject to the bid process rules.
....
The surrounding circumstances show that the parties did not intend to be bound to any agreement.
....
A meeting of the minds cannot be inferred from the language used by the parties.
....
A PSA was a condition precedent to contract formation.
....
Chris Simon's November 20, 2012 e-mail cannot be a contract under the Texas Uniform Electronic Transactions Act because the parties did not agree to conduct business electronically, and because the e-mail lacks an electronic signature.
....
The Cleveland family would have refused to consent to an assignment to [Le Norman], rendering any alleged contract illusory.
The trial court specifically denied the Sellers' summary judgment motions on the statute of frauds for failure to include a sufficient property description and on their assertion that there was no acceptance of the alleged offer. The trial court did not sign any other order either granting or denying the other grounds for summary judgment asserted by the Sellers.
On November 19, 2015, the trial court granted LNO's motion for summary judgment against the Sellers, dismissing all of the Sellers' counter-claims and finally disposing of all of the claims of all of the parties. This appeal followed.
LNO's Appeal of the Trial Court's Summary Judgment Ruling
In three issues on appeal, LNO argues that the trial court erred in dismissing its breach of contract claim on the Sellers' motion for summary judgment.
A. Standard of Review
We review the trial court's grant of a summary judgment de novo. Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex. , 253 S.W.3d 184, 192 (Tex. 2007) ; Valence Operating Co. v. Dorsett , 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV . P. 166a(c) ; Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding , 289 S.W.3d 844, 848 (Tex. 2009). A defendant must conclusively negate at least one essential element of the plaintiff's cause of action to be entitled to summary judgment on a particular claim. Frost Nat'l Bank v. Fernandez , 315 S.W.3d 494, 508 (Tex. 2010).
A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. See City of Keller v. Wilson , 168 S.W.3d 802, 816 (Tex. 2005) ; Cleveland v. Taylor , 397 S.W.3d 683, 697 (Tex. App.-Houston [1st Dist.] 2012, pet. denied). If the movant meets its burden, the burden then shifts to *40 the nonmovant to raise a genuine issue of material fact precluding summary judgment. See Centeq Realty, Inc. v. Siegler , 899 S.W.2d 195, 197 (Tex. 1995). To determine if the nonmovant raised a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. Fielding , 289 S.W.3d at 848 (citing City of Keller , 168 S.W.3d at 827 ); Cleveland , 397 S.W.3d at 697. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. Sw. Elec. Power Co. v. Grant , 73 S.W.3d 211, 215 (Tex. 2002) (citing Sci.Spectrum, Inc. v. Martinez , 941 S.W.2d 910, 911 (Tex. 1997) ); Cleveland , 397 S.W.3d at 697. A genuine issue of material fact is raised when the nonmovant produces more than a scintilla of evidence regarding the challenged element. Neely v. Wilson , 418 S.W.3d 52, 59 (Tex. 2013). More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. King Ranch, Inc. v. Chapman , 118 S.W.3d 742, 751 (Tex. 2003).
We must affirm a summary judgment order if any of the grounds presented to the trial court are meritorious. Provident Life & Accident Ins. Co. v. Knott , 128 S.W.3d 211, 216 (Tex. 2003) ; Cleveland , 397 S.W.3d at 697.
B. Summary Judgment on Contract Formation
In its first issue on appeal, LNO argues that the trial court erred in granting summary judgment based on the Sellers' asserted ground that no contract for the sale of the Kitty Stroker Assets was ever formed between LNO and the Sellers. The Sellers asserted multiple grounds in their motion for summary judgment, including, in relevant part, various arguments that they had no valid contract with LNO regarding the sale of 67% of the Kitty Stroker Assets for $230 million. The Sellers argue that "the undisputed evidence conclusively establishes no meeting of the minds or intent to be bound" and that the Bid Documents' requirement that the parties formalize an agreement in a PSA bars, as a matter of law, any finding that the November 19-20 e-mails constituted a valid contract. The Sellers also argue that the record conclusively establishes that no PSA existed between them and LNO.[5]
The trial court stated that it granted summary judgment in part on the basis that "[t]here was no meeting of the minds because the Confidentiality Agreement, the Bid Instructions, and the Data Room Presentation preclude a binding contract without an executed, delivered purchase and sale agreement, or 'PSA' "; "[t]here was no meeting of the minds because any offer and acceptance was subject to the bid process rules"; "[t]he surrounding circumstances show that the parties did not intend to be bound to any agreement"; "[a] meeting of the minds cannot be inferred from the language used by the parties."
1. Legal principles of contract formation
The existence of a valid contract is one of the essential elements of a breach-of-contract claim. See *41 Dupree v. Boniuk Interests, Ltd. , 472 S.W.3d 355, 364 (Tex. App.-Houston [1st Dist.] 2015, no pet.) (setting out elements of breach of contract claim). Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. Winchek v. Am. Express Travel Related Servs. Co. , 232 S.W.3d 192, 202 (Tex. App.-Houston [1st Dist.] 2007, no pet.) ; see David J. Sacks, P.C. v. Haden , 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract."). Whether the parties formed a contract is generally a fact question, although it may be determined as a matter of law. See T.O. Stanley Boot Co. v. Bank of El Paso , 847 S.W.2d 218, 221-22 (Tex. 1992) ; Harris v. Balderas , 27 S.W.3d 71, 79 (Tex. App.-San Antonio 2000, pet. denied) ; see also Foreca, S.A. v. GRD Dev. Co. , 758 S.W.2d 744, 746 (Tex. 1988) (whether parties intended to enter into binding agreement is often question of fact).
An enforceable and legally binding contract exists if it is sufficiently definite, certain, and clear in its essential terms. Fort Worth Indep. Sch. Dist. v. City of Fort Worth , 22 S.W.3d 831, 846 (Tex. 2000) ; T.O. Stanley Boot Co. , 847 S.W.2d at 221. A binding agreement may exist when parties agree on some terms sufficient to create a contract, leaving other provisions for later negotiation. Gen. Metal Fabricating Corp. v. Stergiou , 438 S.W.3d 737, 744 (Tex. App.-Houston [1st Dist.] 2014, no pet.) ; Crisp Analytical Lab, L.L.C. v. Jakalam Props., Ltd. , 422 S.W.3d 85, 89 (Tex. App.-Dallas 2014, pet. denied). "When an agreement leaves essential (or material) matters open for future negotiation and those negotiations are unsuccessful, however, the agreement 'is not binding upon the parties and merely constitutes an agreement to agree.' " Stergiou , 438 S.W.3d at 744 (quoting Fort Worth Indep. Sch. Dist. , 22 S.W.3d at 846 ).
The question of what terms are essential to a contract is determined on a contract-by-contract basis, depending on the subject matter of the contract at issue. T.O. Stanley Boot Co. , 847 S.W.2d at 221. The parties must have a meeting of the minds and must communicate consent to the essential terms of the alleged agreement, which is determined based on an objective standard of what the parties said and did rather than on their subjective states of mind. Baroid Equip., Inc. v. Odeco Drilling, Inc. , 184 S.W.3d 1, 17 (Tex. App.-Houston [1st Dist.] 2005, pet. denied) ; Angelou v. African Overseas Union , 33 S.W.3d 269, 279-80 (Tex. App.-Houston [14th Dist.] 2000, no pet.).
2. Summary judgment on contract formation grounds
One of the Sellers' primary contentions, both in the trial court and on appeal, is that any potential contract between LNO and the Sellers was subject to the Bid Documents and the Confidentiality Agreement. The Sellers assert that the terms of these documents precluded the existence of a valid, binding contract in the absence of an executed PSA. However, LNO asserts that it raised a genuine issue of material fact regarding whether the alleged contract set out in the November 19-20, 2012 e-mails was subject to the bid process rules. We agree with LNO.
LNO presented evidence that its November 19 e-mail was sent after the initial bid process had concluded and after the procedure set out in those documents failed to result in a sale of the Assets. Specifically, on November 14, following the Sellers' counter-offer to LNO's bid submitted pursuant to the procedures outlined in *42 the Bid Documents, LNO responded that it could "no longer pursue the ... transaction as altered by the Sellers." The terms of LNO's November 19 e-mail likewise constitute some evidence that the November 19 offer was not made pursuant to the bid procedures. Unlike LNO's earlier bids-which conformed to the format required by the Bid Documents and expressly stated that the bids were made pursuant to the bid procedures-the November 19 offer did not follow the format requested in the Bid Documents and did not state that it was made in accordance with the bid procedures.
The deadlines, both express and implied, contained in the November 19 offer contradicted the terms of the bid procedures as well. The Bid Documents provided a November 5, 2012 deadline for submitting bids, which the Sellers extended to November 9, 2012, for both Jones Energy and LNO to submit revised bids. The Bid Documents also explained that each Seller was to receive 24 hours to make a written election regarding its participation in the transaction. By contrast, LNO's November 19 e-mail offer was made after the deadline contemplated by the Bid Documents and requested an immediate response.
Significantly, the Sellers' own conduct in continuing to negotiate with LNO even after it deviated from the bid procedures-beginning on November 14 when LNO informed Chalker Energy via e-mail that it could "no longer pursue the ... transaction as altered by the Sellers" and continuing through Chalker Energy's November 20 e-mails stating that the Sellers were "confirmed to sell" and were awaiting finalization of the PSA based on the drafts that had passed between the parties during prior negotiations-raises a fact question regarding whether the parties intended to enforce or rely upon the procedures set out in the Bid Documents during their November 19-20 negotiations. In fact, in the bid recommendation sent to the Sellers by Chalker Energy informing them of LNO's November 19 offer, Chalker Energy recognized that, although the Bid Documents required that the Sellers receive 24 hours to make their written elections, LNO's offer had "a deadline for response of today at 5 00PM," and it asked for the Sellers to give "immediate attention to this election notice and a response by no later than 4 00 PM today, Tuesday November 20, 2012." As evidenced by Chalker Energy's November 20 e-mail thanking the Sellers "for responding in such a timely manner today," none of the Sellers objected to this deviation from the bid procedures prior to Chalker Energy's notification to LNO "that we had the 67% interest committed to sell and are on board for moving forward with finalizing the PSA and the additional documents associated with the Transaction."
Furthermore, contrary to the Sellers' arguments, the plain language of the Confidentiality Agreement does not preclude, as a matter of law, the existence of a valid, binding contract in the absence of an executed PSA. The Confidentiality Agreement entered into between LNO and Chalker Energy provided that "until a definitive agreement has been executed and delivered, no contract or agreement providing for a transaction between the Parties shall be deemed to exist." The Confidentiality Agreement provided that a letter of intent or preliminary agreement was not a "definitive agreement," but it did not specify what constituted a "definitive agreement." The November 19-20 e-mails and written elections of the Sellers constitute a writing that sets out the assets to be sold, the purchase price, a closing day, and other key provisions. Thus, a fact issue exists as to whether the November 19-20 e-mail chain and subsequent written elections were sufficient to constitute a "definitive *43 agreement" for the sale of the Assets. See T.O. Stanley Boot Co. , 847 S.W.2d at 221-22 (holding that formation of binding contract is generally fact question); see also Winchek , 232 S.W.3d at 202 (setting out elements of valid contract).
The Sellers also argue that "the undisputed evidence conclusively establishes no meeting of the minds or intent to be bound" and that the record conclusively establishes that no PSA existed between them and LNO. While LNO agrees that the parties never executed a PSA, it also points out that several draft PSAs were exchanged between the parties and that at least Chalker Energy and one other Seller did not have any substantive objections to LNO's modifications to the form PSA. LNO's November 19 e-mail offer anticipated that the PSA would be executed fairly immediately-"on or before" November 20, 2012.
LNO argues that finalization and formal execution of the PSA were not necessary for the parties to have had a meeting of the minds and to have formed the intent to be bound to the terms of the sale. LNO argues that it raised a fact question as to whether the parties intended to be bound by the terms set out in the November 19-20 e-mails and as to whether the November 19-20 e-mails and written elections were sufficiently definite, certain, and clear as to the essential terms of the sale as to constitute an enforceable contract, precluding summary judgment on this ground. See Fort Worth Indep. Sch. Dist. , 22 S.W.3d at 846 (holding that enforceable and legally binding contract exists if it is sufficiently definite, certain, and clear in its essential terms); T.O. Stanley Boot Co. , 847 S.W.2d at 221 (holding that whether parties formed enforceable contract is generally fact-intensive and determination of what terms are essential to contract is determined on contract-by-contract basis, depending on subject matter of contract at issue). Again, we agree with LNO.
The record demonstrates that LNO's November 19 e-mail set out seven specific terms relevant to the proposed sale-indicating a sale of "67% of the 8/8ths RJ supplied database property set" for "$230M," an execution of the PSA the next day, and a closing date of December 12, 2012, among other terms-and stated that LNO "needed to know now if this [offer] is accepted"; that LNO would "not be modifying or accepting any changes to the base deal described above"; and that the Sellers had until 5:00 p.m. the following day to accept the offer. Chalker Energy presented this offer to the Sellers, and they provided their written elections to participate in the transaction. Simon then sent a reply to Le Norman at LNO on November 20, 2012, at 4:49 p.m. stating, "We have the group on board to deliver 67% subject to a mutually agreeable PSA. We were calling to discuss next steps and timing. Chalker et al. will be turning a PSA tonight to respond to your last draft. Please give me a call to discuss schedule and timing."
That same evening, Dukes, on behalf of Chalker Energy, sent an e-mail to the Sellers stating, "Thanks to you all for responding in such a timely manner today. We notified Le Norman prior to the 5:00 pm deadline that we had the 67% interest committed to sell and are on board for moving forward with finalizing the PSA and the additional documents associated with the Transaction." And at least one Seller testified in his deposition that, as of November 20, 2012, he intended to sell his interest in the Assets to LNO. In an e-mail to LNO, Chalker Energy referred to the Assets as "what is being sold to Le Norman." Remora sent an e-mail congratulating one of LNO's private equity investors on the sale. Chalker Energy e-mailed spreadsheets detailing the "interest being *44 sold for each area" and stating that "each area delivers a 67% WI to the buyer." This constitutes at least some evidence that the parties agreed and had a meeting of the minds on the essential terms of the sale sufficient to create a contract, even if they left other provisions for later negotiation, and that both parties communicated consent to those essential terms. See Stergiou , 438 S.W.3d at 744 ; Baroid Equip., Inc. , 184 S.W.3d at 17.
The Sellers rely on WTG Gas Processing, L.P. v. ConocoPhillips Co. , 309 S.W.3d 635 (Tex. App.-Houston [14th Dist.] 2010, pet. denied), as a case "strikingly on-point with the facts and issues" here. WTG involved a similar sales transaction, in which ConocoPhillips sold a natural gas processing facility to a group of buyers, collectively referred to as Targa, instead of selling it to the losing bidder WTG. Id. at 637. ConocoPhillips promulgated a Confidential Information Memorandum ("CIM") that it required the bidders to sign, outlining a bid procedure that was largely similar to the process used here by the Sellers, including provisions stating that ConocoPhillips did not intend to be bound absent the execution of a PSA. See ids="7325607" index="40" url="https://cite.case.law/sw3d/309/635/">id. at 637-38. WTG and other entities, specifically Targa, submitted bids, and WTG's bid expressly stated that it was made "[i]n accordance with" the CIM and bid procedures. Id. at 638. ConocoPhillips decided to "go forward with" WTG's bid and made such a representation to WTG in a phone conversation. Id. The parties then engaged in a negotiation process during which ConocoPhillips periodically updated WTG on the status of other bids and informed WTG that it was still seeking the best possible deal. Id. at 638-39.
WTG argued that "[a]lthough a PSA was never executed," ConocoPhillips nevertheless "accepted WTG's offer during [the phone conversation] by representing that ConocoPhillips had decided 'to go forward with' WTG, they had a 'deal,' ConocoPhillips had 'immaterial' changes to WTG's PSA, and 'the parties' would 'proceed to get it signed.' " Id. at 643. The Fourteenth Court of Appeals held that "as a matter of law, ConocoPhillips negated formation of a contract." Id. at 642. It concluded that "the bid procedures unequivocally provided that ConocoPhillips did not intend to accept an offer, or bear any contractual obligations to another party, absent execution of a PSA." Id. at 645. Thus, the court concluded, the execution of a PSA was clearly a condition precedent to contract formation and not merely a memorialization of an existing contract. Id. The court held that the provisions reflecting intent not to be bound were contained within the bid procedures promulgated by ConocoPhillips and that WTG made its bid expressly in accordance with those procedures. Id. at 646.
We hold that WTG is distinguishable from this case in several key aspects. First, the parties in WTG stipulated that WTG's bid was made in accordance with ConocoPhillips's bid procedure, but LNO has made no such concession here. Rather, one key point of contention between the parties involves whether the bid procedures were followed or were binding on the parties when LNO made its November 19 offer. As we discussed above, the summary judgment evidence here raises a fact issue on that question.
Second, the alleged contract in WTG was an oral contract based on representations made during the course of a telephone call that occurred during on-going negotiations. Here, by contrast, the alleged contract is in writing. LNO's claim for the existence of a contract is based on its e-mailed offer made on November 19, written elections by each Seller agreeing to accept the terms of the offer, and a communication *45 from the Sellers of purported agreement, likewise e-mailed, on November 20.
Third, unlike in WTG , nothing in the agreements before us indicates, as a matter of law, that the execution of a PSA specifically was a condition precedent to contract formation or that the writings outlined above could not constitute a "definitive agreement" as intended under the Confidentiality Agreement between LNO and Chalker Energy. We have already determined that LNO raised a fact issue as to whether the November 19-20 e-mails and elections by the Sellers constituted a "definitive agreement" as contemplated by the Confidentiality Agreement or whether it constituted an otherwise enforceable agreement, entered outside the bid process, that set out the material terms of the proposed sale.
The Sellers also point to the WTG court's rejection of WTG's argument that, in making representations during a phone conversation that it had decided "to go forward with" WTG and that they had a "deal," ConocoPhillips waived the bid procedures. Id. at 648. The WTG court concluded, "Considering the surrounding facts and circumstances, including the purpose of the bid process and procedures and ConocoPhillips's actions after the phone conversation, we conclude the oral representations were insufficient as a matter of law to constitute waiver of the bid procedures at issue." Id. The WTG court looked at ConocoPhillips's conduct after the alleged oral agreement was created. Id. at 650. ConocoPhillips informed WTG throughout the negotiation process that it was still assessing other bids; it informed WTG periodically of the status of negotiations with the other party; and at one point it even referred to WTG as a "good alternative" if the negotiations with the other party fell through. Id. at 651. The summary judgment record in WTG contained "e-mails reflect[ing] ConocoPhillips's view that it had not yet formed a binding contract" in that it made references to "starting down the road" with WTG and "moving forward with due diligence and PSA negotiations." Id. at 650-51.
Here, the summary judgment record contains at least some evidence creating a fact issue regarding whether the circumstances surrounding the November 19-20 e-mails and negotiations and the Sellers' subsequent conduct reflected an intent to proceed without reference to or reliance on the bid procedures and enter into a binding agreement with LNO for the sale of the Assets. By November 19, the parties had already exchanged at least one draft of the PSA and had engaged in detailed negotiations. Rather than informing LNO that they were also considering a bid from Jones Energy at the same time that the November 19-20 negotiations were occurring, the Sellers represented to LNO that they were "committed to sell" their assets to LNO and that they could turn to finalizing the PSA after the Thanksgiving holiday. At least one seller, John Talley, testified in his deposition that, on November 20, 2012, it was his intention to sell his interest in the Assets to LNO.
Various e-mails continued to pass between the parties, including an e-mail from Chalker to LNO discussing the Assets and referring to them as "what is being sold to Le Norman." Likewise, a representative of Remora congratulated one of LNO's private equity investors on "winning the bid," stating, "[LNO] is going to do great with our [Assets]." Chalker e-mailed spreadsheets detailing the "interest being sold for each area" and stating that "each area delivers a 67% WI to the buyer." On November 21, 2012, the day after the Sellers elected to accept LNO's November 19 offer, a representative from Jones Energy e-mailed *46 one of the Sellers, Remora, stating, "We just heard we lost the deal again." The representative of Remora responded, "I'm sorry it turned out this way. If anything changes on this end, I will be the first to let you know." This conduct on the part of the Sellers is materially different from the conduct of ConocoPhillips relied upon by the Fourteenth Court of Appeals in reaching its conclusion in WTG . Accordingly, we conclude, in contrast to WTG , that LNO presented sufficient summary judgment evidence to raise a genuine issue of material fact on the issue of whether the parties formed a contract for the sale of 67% of the Kitty Stroker Assets for $230 million.
The guidance of the Texas Supreme Court on the question of whether the issue of contract formation should have been submitted to a fact finder is applicable here. In Railroad Commission of Texas v. Gulf Energy Exploration Corp. , 482 S.W.3d 559 (Tex. 2016), the supreme court examined its previous holdings in Foreca, S.A. v. GRD Development Co. , which addressed the " 'increasingly common [situation] in business negotiations' in which an '[a]greement was reached as to certain material terms, yet another formal document was contemplated by the parties.' " Id. at 572 (quoting Foreca , 758 S.W.2d at 745 ). The supreme court reiterated that the determination of whether a "contemplated formal document" was a condition precedent to the formation of a contract or "merely a memorial of an already enforceable contract" depended on the intent of the parties, which is usually a question for the trier of fact. Id. at 572-73 (quoting Foreca , 758 S.W.2d at 746 ).
In Foreca , the supreme court concluded that, even though the documents evidencing the alleged agreement stated that they were "subject to legal documentation" to be drafted by one party's attorney, such language was not conclusive, the evidence was disputed as to the parties' intent to be bound before execution of the contemplated legal documentation, and the issue was properly submitted to the jury. Foreca , 758 S.W.2d at 745-46 ; see Gulf Energy Explor. , 482 S.W.3d at 573.
In Gulf Energy , the court applied this principle in considering the conflicting evidence as to whether the parties in that case "intended to be bound by the oral agreement reached at the May 19 meeting, or whether the formal [agreement] subsequently signed by the parties was necessary for the formation of a binding contract." 482 S.W.3d at 573. The court looked at evidence such as testimony of involved parties regarding their intent, memoranda from involved entities, and e-mail exchanges evincing a conflicting view of whether the parties intended to be bound; and it determined that such conflicting evidence created a disputed fact issue. Id. at 573-74. The court stated, "The question of the parties' intent to be bound is usually one of fact, and we cannot say that this case presents the unusual situation in which that question may be decided as a matter of law." Id. at 574.
Similarly to Foreca and Gulf Energy , although the Sellers' acceptance of LNO's offer was "subject to a mutually agreeable PSA," that language was not conclusive. The evidence is disputed as to the parties' intent to be bound before execution of the contemplated legal documentation. LNO presented more than a scintilla of evidence that the Bid Documents and other bid procedures did not apply to the negotiations between the parties as of November 19, 2012. And LNO presented at least some evidence that the November 19-20 offer and acceptance was a "definitive agreement" setting out the material terms for the sale of the Assets. Here, as in Gulf Energy , the evidence in the summary *47 judgment record does not present an "unusual situation" in which the question of the parties' intent to be bound can be decided as a matter of law. See ids="6820063" index="63" url="https://cite.case.law/sw3d/482/559/">id.
Thus, we conclude that the trial court erred in granting the Sellers' motion for summary judgment on this issue.
We sustain LNO's first issue.
C. Summary Judgment on the UETA
The trial court also granted summary judgment in favor of the Sellers on the basis that "Chris Simon's November 20, 2012 e-mail cannot be a contract under the Texas Uniform Electronic Transactions Act because the parties did not agree to conduct business electronically, and because the e-mail lacks an electronic signature."
Under the UETA, a legal requirement of a writing can be satisfied with an electronic record, and a legal requirement of a signature can be satisfied by an electronic signature. TEX. BUS. & COM. CODE ANN. § 322.007(c), (d) (West 2015). The UETA applies "only to transactions between parties each of which has agreed to conduct transactions by electronic means." Id. § 322.005(b) (West 2015). Contrary to the Sellers' argument, the UETA does not require an explicit agreement to conduct transactions by electronic means, but instead provides, "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Id.
The conduct of the parties here in engaging in negotiations and other relevant business via electronic means constitutes at least some evidence that the parties agreed to conduct some of their transactions electronically. See id. ; see also In re Rhee , 481 B.R. 880, 894 (Bankr. S.D. Tex. 2012) (stating that agreement to conduct transactions by electronic means under UETA "need not be explicit"); Dittman v. Cerone , No. 13-11-00196-CV, 2013 WL 5970356, at *7-8 (Tex. App.-Corpus Christi Oct. 31, 2013, no pet.) (mem. op.) (holding that evidence was sufficient to support finding that parties intended to conduct some of their transactions electronically where "[t]he trial court's findings of fact are replete with instances where the parties exchanged communications regarding offers and counter-offers about the Stable Property via e-mail messages"); Unique Staff Leasing, LLC v. Onder , No. 13-09-00213-CV, 2010 WL 5621289, at *8 n.10 (Tex. App.-Corpus Christi Dec. 9, 2010, no pet.) (mem. op.) (noting that testimony that most communications between parties were conducted via e-mail, record containing several e-mails documenting conversations, and fact that one party used electronic means to send its independent contractor agreement supported jury's finding that parties agreed to transact business electronically).
Furthermore, the e-mails that LNO alleges formed the basis of the agreement between the parties identified the sending parties in the "from" line and contained names or signature blocks identifying the senders. This raises at least a fact question regarding whether the e-mails were signed electronically. See Khoury v. Tomlinson , 518 S.W.3d 568, 575-76 (Tex. App.-Houston [1st Dist.] 2017, no pet.) (discussing requirements of electronic signature) (citing TEX. BUS. & COM. CODE ANN. § 322.002(8) (West 2015) (defining "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record")).
The Sellers rely on *48 Cunningham v. Zurich American Insurance Co. , 352 S.W.3d 519 (Tex. App.-Fort Worth 2011, pet. denied). In Cunningham , the Fort Worth Court of Appeals held that a signature line within an e-mail did not constitute a signature under the UETA. 352 S.W.3d at 529-30. However, we rejected this conclusion in Khoury , noting that the Fort Worth Court of Appeals "offered no explanation for why physically typing in a signature line at the time of drafting the e-mail should be required for a 'signature block' to constitute a signature." Khoury , 518 S.W.3d at 577-78 (citing Williamson v. Bank of New York Mellon , 947 F.Supp.2d 704, 710-11 (N.D. Tex. 2013) ). We held that a name or e-mail address in the "from" field functions as a signature in e-mail, and we stated that a signature block in an e-mail performs the same authenticating function as the "from" field and also satisfies the requirement of a signature under the UETA. Id. at 578.
Thus, the summary judgment record here contains at least some evidence that the relevant e-mails were signed as defined in the UETA. The trial court erred in granting summary judgment on this issue as a matter of law.
We sustain LNO's second issue.
D. Summary Judgment on Ground that Contract Was Illusory
In its third issue on appeal, LNO asserts that the trial court erred in granting summary judgment on the ground that "[t]he Cleveland family would have refused to consent to an assignment to [Le Norman], rendering any alleged contract illusory." See, e.g. , In re 24R, Inc. , 324 S.W.3d 564, 567 (Tex. 2010) (per curiam) (orig. proceeding) (holding that when illusory promises are only consideration that supports purported bilateral contract, there is no mutuality of obligation, and therefore, no contract); Speedemissions, Inc. v. Bear Gate, L.P. , 404 S.W.3d 34, 47 (Tex. App.-Houston [1st Dist.] 2013, no pet.) (holding that "[a] promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance," and concluding that contract provisions were not illusory because they did not provide either party with unilateral option to discontinue performance, but instead "describe[d] the rights and liabilities of the parties under various contemplated contingencies").
We have already concluded that fact questions remain regarding whether the parties formed an agreement for the sale of the Assets. Because there are questions of fact that must be resolved in order to determine the nature of the agreement between LNO and the Sellers, if any, we cannot determine as a matter of law, under the particular facts of this case, whether such a contract is illusory. Thus, the trial court likewise erred in reaching such a conclusion as a matter of law.
We sustain LNO's third issue.
E. Additional Grounds Asserted by Sellers on Appeal
The Sellers argue that the trial court's judgment could also be affirmed on the basis of other summary judgment grounds that they asserted in the trial court but that were denied by the trial court.[6] See, e.g. , *49 WTG Gas Processing , 309 S.W.3d at 642 (disposing of case on summary judgment ground denied by trial court) (citing Cincinnati Life Ins. Co. v. Cates , 927 S.W.2d 623, 625-26 (Tex. 1996) (holding that appellate court, when reviewing summary judgment, should consider all grounds on which trial court ruled and movant preserved for appellate review that are necessary for final disposition of appeal)). Specifically, the Sellers argue that LNO's claims are barred by the statute of frauds because the November 19-20 e-mails lack material terms. They argue that the e-mails do not identify which specific property interests were allegedly being sold or by which particular owners. See, e.g. , Greer v. Greer , 144 Tex. 528, 191 S.W.2d 848, 849 (1946) (holding that instrument conveying land must contain sufficient legal description, or it is void under statute of frauds).
Here, the purported agreement was not for a conveyance of land, but for a sale of real property interests. "A sale, in its most basic terms, includes the following elements: (1) the thing sold, which is the object of the contract; (2) the consideration or price to be paid for the thing sold; and (3) the consent of the parties to exchange the thing for the price." John Wood Grp. USA, Inc. v. ICO, Inc. , 26 S.W.3d 12, 20 (Tex. App.-Houston [1st Dist.] 2000, pet. denied). Once the parties have reached an agreement on principal terms, a deal may be formed even though the parties leave other terms open, to be agreed upon at a later time. Id. at 19-20 ; see T.O. Stanley Boot Co. , 847 S.W.2d at 221 (agreement on "essential terms" necessary for contract formation). "That is, nonessential terms may be supplied later if the parties have agreed to a sale on the 'essential terms.' " John Wood Grp. , 26 S.W.3d at 19-20. "The issue of whether [an] ... agreement fails for lack of essential terms is 'a question of law to be determined by the court, unless there is ambiguity or unless surrounding facts and circumstances demonstrate a factual issue as to an agreement.' " Stergiou , 438 S.W.3d at 744 (quoting Ronin v. Lerner , 7 S.W.3d 883, 888 (Tex. App.-Houston [1st Dist.] 1999, no pet.) ).
The November 19-20 e-mails set out the essential elements of the thing to be sold and the price: "$230 M for 67% of the 8/8ths RJ supplied database property set." They also included a closing date and other material terms, such as a requirement that the purchased assets not be subject to the Sellers' earlier development agreement and that any owners who would not be selling their interest must enter into a joint operating agreement. We cannot say that this agreement fails as a matter of law for failure to state a material term. See Stergiou , 438 S.W.3d at 744. And if there is some ambiguity in these terms or, as we have already stated, if surrounding facts and circumstances demonstrate a factual issue as to an agreement, that situation creates a question of fact that precludes summary judgment on this issue. See ids="6918713" index="88" url="https://cite.case.law/sw3d/438/737/#p744">id.
The Sellers argue that "RJ supplied database property set" is not a properly defined term; however, the summary judgment evidence demonstrates that Raymond James provided LNO with a specific list or database detailing the property that was available for sale. Considering the parties' course of dealing and the information exchanged throughout the negotiation process, the material issue here is not the identification of the specific interests being conveyed-which can be identified based on the written elections to sell to LNO and other documents that *50 were part of the parties' contemporaneous negotiations-but rather whether the parties agreed to be bound to sell those assets for the $230 million offered by LNO. And as discussed above, LNO raised a genuine issue of material fact on that issue.
We conclude that the trial court properly denied summary judgment on this ground.
The Sellers' Appeal of Trial Court's Denial of Relief
The Sellers filed counter-claims against LNO. All of the Sellers counter-claimed that LNO breached the Confidentiality Agreement when it filed its own breach-of-contract claim. The Sellers also sought declaratory judgments stating that the terms of the Confidentiality Agreement, Data Room Presentation, and Bid Documents applied to the November 19-20 e-mails, and they sought attorney's fees under Civil Practice and Remedies Code chapters 37 and 38.[7] Chalker Energy also filed counter-claims seeking a declaration that no binding agreement for the sale of the Assets to LNO existed and, thus, Chalker Energy was free to sell its interest to Jones Energy. Chalker Energy further asserted that LNO breached an agreement created by the Data Room Presentation by failing to return the presentation materials. Finally, the remaining Sellers, the Raptor Parties and the Roach Parties, sought a declaration that LNO had no viable claim against Jones Energy.
LNO filed a single traditional and no-evidence motion for summary judgment against the counter-claims asserted by the Sellers. The trial court granted this motion for summary judgment, and the Sellers appealed. Specifically, they challenge the trial court's grant of summary judgment in LNO's favor on the Sellers' counter-claims for breach of the purportedly binding bid procedures, the denial of their claims for declaratory judgment and related attorney's fees, and the trial court's allocation of costs.
A. Summary Judgment on the Sellers' Breach of Contract Claims
In their first issue on appeal, the Sellers argue that the trial court erred in rendering a take-nothing judgment on their counter-claims for LNO's breach of the Bid Documents.
1. Alleged breach of the Confidentiality Agreement or other Bid Documents
All of the Sellers asserted that LNO breached the Confidentiality Agreement and failed to follow the bid procedure set out in the Confidentiality Agreement and Bid Documents, including the Data Room Presentation, when it pursued its own breach-of-contract claim based on the Sellers' failure to honor the purported agreement in the November 19-20 e-mails to sell a 67% interest in the Kitty Stroker Assets for $230 million. Chalker Energy also counter-claimed for breach of contract, asserting that LNO breached the terms of the Data Room Presentation by failing to return certain materials.
LNO moved for summary judgment on these claims, including asserting a no-evidence ground in which it argued that the Sellers had presented no evidence of damages as a result of any purported breach by LNO of the Confidentiality Agreement or Bid Documents. See TEX. R. CIV . P. 166a(i) ("After adequate time for discovery, *51 a party ... may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial."). The Sellers argued, in summary judgment proceedings and on appeal, that it presented some evidence of damages in that it presented evidence of its out-of-pocket damages in the form of fees paid to Raymond James and of expectancy damages in the form of attorney's fees and litigation costs incurred because LNO filed its breach of contract suit rather than recognizing that the Bid Documents precluded the formation of an agreement absent a written PSA. The Sellers also point to the escrow funds that were withheld by Jones Energy upon its learning of LNO's demands that the Sellers honor their purported agreement with LNO and LNO's subsequent filing of this lawsuit.
LNO argues that none of these damages constitute damages resulting from its purported breach of the Confidentiality Agreement or other bid procedures set out in the Bid Documents, and we agree. The fees owed to Raymond James were not caused by any alleged breach by LNO; rather, the Sellers owed Raymond James such fees for its work facilitating the sale of the Assets regardless of whether LNO had ever been involved. The Raymond James fees are not a loss sustained as a result of LNO's purported breach by filing its own lawsuit. See e.g. , Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P. , 391 S.W.3d 596, 607 (Tex. App.-Houston [14th Dist.] 2012, no pet.) ("The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach.").
The Sellers' court costs and attorney's fees incurred in defending against LNO's suit likewise do not constitute "expectancy damages" and are not recoverable as separate damages, independent of a finding that they have prevailed on a breach of contract claim. See In re Nalle Plastics Family Ltd. P'ship , 406 S.W.3d 168, 171-75 (Tex. 2013) (holding that attorney's fees incurred in prosecuting or defending litigation are not compensatory damages and thus need not be superseded pending appeal under Civil Practice and Remedies Code section 52.006 ); Alma Grp., L.L.C. v. Palmer , 143 S.W.3d 840, 846 (Tex. App.-Corpus Christi 2004, pet. denied) (holding party not entitled to recover attorney's fees without also recovering damages for breach of contract in part because "attorney fees are in the nature of costs, not damages"); see also Parkway Dental Assocs. , 391 S.W.3d at 607 (holding that purpose of contract damages is to restore non-breaching party to economic position it would have occupied had contract been performed).
And there is no evidence in the record that Jones Energy's independent decision to withhold escrow funds based on what it believed to be the Sellers' breach of the Jones Energy PSA was in any way attributable to a breach of the Confidentiality Agreement or other bid procedures by LNO. Contrary to the Sellers' assertion, there is no evidence that LNO's filing of the lawsuit caused Jones Energy to withhold escrow funds; rather, the record demonstrates that it was Jones Energy's perception that, in failing to disclose the existence of LNO's demands prior to closing, the Sellers themselves breached the Jones Energy PSA.
We conclude that the Sellers failed to present evidence raising a genuine issue of material fact in response to LNO's no-evidence summary judgment on this *52 ground.[8] Accordingly, the trial court did not err in granting summary judgment on these claims. See TEX. R. CIV. P. 166a(i) ("The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.").
2. Attorney's fees
The Sellers did not prevail on their claims and thus are not at this time entitled to attorney's fees. See, e.g. , TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2015) ; Green Int'l, Inc. v. Solis , 951 S.W.2d 384, 390 (Tex. 1997) ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."). Accordingly, we need not address LNO's additional arguments on this point.
B. Summary Judgment on the Sellers' Declaratory Judgment Claims
1. The Raptor and Roach Parties' claim seeking a declaration regarding Jones Energy's liability to LNO
The Raptor and Roach parties sought a declaration "that [LNO] has no viable cause of action against Jones Energy." They asserted this counter-claim after LNO had nonsuited its claim for tortious interference against Jones Energy and those parties had reached a settlement. LNO argues that the Raptor parties and Roach parties had no standing to assert this claim and that any such claims failed to present a justiciable controversy between parties to this suit.
The requirement that a claim be justiciable or ripe applies to declaratory judgment actions. Brooks v. Northglen Ass'n , 141 S.W.3d 158, 163-64 (Tex. 2004). The Uniform Declaratory Judgment Act "gives the court no power to pass upon hypothetical or contingent situations, or determine questions not then essential to the decision of an actual controversy, although such questions may in the future require adjudication." Riner v. City of Hunters Creek , 403 S.W.3d 919, 922 (Tex. App.-Houston [14th Dist.] 2013, no pet.). A declaratory judgment is appropriate if (1) a justiciable controversy exists as to the rights and status of the parties and (2) the controversy will be resolved by the declaration sought. Brooks , 141 S.W.3d at 163-64 ; Tex. Dep't of Public Safety v. Moore , 985 S.W.2d 149, 153 (Tex. App.-Austin 1998, no pet.) (citing Bonham State Bank v. Beadle , 907 S.W.2d 465, 467 (Tex. 1995) ). "A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest[s] and not merely a theoretical dispute." Moore , 985 S.W.2d at 153.
Here, no real or substantial controversy existed between LNO and Jones Energy because at the time the Sellers asserted their claim and LNO moved for summary judgment, LNO had nonsuited any claims against Jones Energy and those two parties had reached a settlement. See Brooks , 141 S.W.3d at 163-64 ; Moore , 985 S.W.2d at 153. Likewise, a declaration of any potential liability between Jones Energy and LNO would not resolve any controversy among the Roach parties, the Raptor parties, and LNO. See Brooks , 141 S.W.3d at 163-64 ; Moore , 985 S.W.2d at 153. And none of the Sellers here have demonstrated standing to raise this type of claim on behalf of Jones Energy. See Williams v. Lara , 52 S.W.3d 171, 184 (Tex. 2001) (holding *53 that, for plaintiff to have standing, controversy must exist between parties at every stage of legal proceedings, including on appeal).
The trial court correctly granted summary judgment on this claim.
We affirm the trial court's summary judgment on this claim.
2. Remaining declaratory judgment claims
In the remaining declaratory judgment claims, the Sellers sought declarations relating to LNO's breach of contract claims. They sought declarations that the bid procedures were in full force and effect at the time the parties wrote the November 19-20 e-mails; that no binding purchase agreement existed between them and LNO; that the Sellers did not breach any such agreement; that they had the right to negotiate with and sell the Assets to Jones Energy; and that they are not liable to LNO for breach of any sale agreement. For the reasons set out above, we conclude that fact issues remain regarding what contract, if any, existed between the parties and what, if any, their respective obligations were. Thus, summary judgment on this ground was improper.
We reverse the trial court's summary judgment on these claims and the related issue of attorney's fees under Civil Practice and Remedies Code section 37.009.[9]
C. Trial Court's Allocation of Costs
Finally, the Sellers argue that they are prevailing parties and are entitled to costs as a matter of law. They rely on Rule of Civil Procedure 131, which provides, "The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX. R. CIV. P. 131. Because we are remanding this case for further consideration and the Sellers are not at this time prevailing parties, we need not address this issue on appeal.
Conclusion
We reverse the portion of the trial court's judgment granting summary judgment on Le Norman's breach of contract claim and on the Sellers' related claims for declaratory judgment that they did not breach any contract with Le Norman. We affirm the remainder of the trial court's judgment. We remand for further proceedings consistent with this opinion.

LNO included Jones Energy as a defendant in its original petition, asserting a cause of action for tortious interference. However, LNO and Jones Energy subsequently settled and LNO nonsuited that claim. Jones Energy is not a party to this appeal.

The "Raptor Parties" include Raptor Petroleum, LLC; BMW Investments, L.P.; Ark-La-Tex Property Investments, LP; Remora Oil & Gas, LLC; Eastern Redbud, LLC; Jimmy Sutton; Vicenergy, LLC; Chris Faulker d/b/a Terra Geological, LLC; Jerry Caylor; Larry Caylor; John Talley; Erickson Resources, LLC; John G. Kremer, Trustee for the 1st Amendment to the Richard E. and Betty V. Kremer Living Trust Dated 1/3/2002; M&D Exploration, LLC; and Joe D. Nobles.

The "Roach Parties" include R. Byron Roach, Trustee, LLC and Russell L. Roach.

The Sellers also filed no-evidence motions for summary judgment asserting that there was no evidence that a PSA existed between themselves and LNO. The trial court denied these no-evidence motions. The Sellers further argued in traditional summary judgment motions that no enforceable contract existed between the parties because they had never accepted LNO's purported offer; no contract was executed or delivered; LNO's purported contract failed under the statute of frauds because it contained an insufficient property description; LNO was using an improper measure for determining its damages; and Raymond James lacked actual or apparent authority to bind Chalker Energy or the other Sellers to a PSA.

The Sellers argue, in part, that "[t]o survive summary judgment on its contract claim, LNO was required to present legally sufficient evidence that an enforceable contract existed." In the summary judgment context, a plaintiff seeking to avoid summary judgment on its claim must raise a genuine issue of material fact, and anything more than a mere scintilla of evidence meets that standard. See Neely v. Wilson , 418 S.W.3d 52, 59 (Tex. 2013) ; King Ranch, Inc. v. Chapman , 118 S.W.3d 742, 751 (Tex. 2003).

The Sellers also argue that we should consider grounds asserted in their summary judgment motions that were not ruled on by the trial court. However, grounds or motions that are not ruled on by the trial court are not preserved for appellate review and, thus, are improper for us to consider. See Tex. R. App . P. 33.1 ; Cincinnati Life Ins. Co. v. Cates , 927 S.W.2d 623, 625-26 (Tex. 1996) (holding that appellate court, when reviewing summary judgment, should consider all grounds on which trial court ruled and movant preserved for appellate review that are necessary for final disposition of appeal). Accordingly, we do not consider the Sellers' argument that Raymond James lacked authority to bind any of the Sellers to a PSA with LNO because the trial court never ruled on the Sellers' partial summary judgment based on agency principles.

The Sellers also sought sanctions under Rule of Civil Procedure 13 and Civil Practice and Remedies Code chapter 10. The trial court denied this request, and the Sellers do not challenge that ruling on appeal.

Because we affirm the trial court's judgment on the no-evidence ground, we need not address LNO's arguments that section 18 of the Confidentiality Agreement was a condition, not a covenant; that its claims are privileged; or that the Data Room Presentation was not a contract. See Ford Motor Co. v. Ridgway , 135 S.W.3d 598, 600 (Tex. 2004).

LNO also argues that the Sellers' declaratory judgment claims on these issues improperly recast claims and defenses already at issue in the case, barring the Sellers from recovering attorney's fees pursuant to the Declaratory Judgment Act. See, e.g. , Washington Square Fin., LLC v. RSL Funding, LLC , 418 S.W.3d 761, 775 (Tex. App.-Houston [14th Dist.] 2013, pet. denied) ("[A] defendant is not entitled to recover attorney's fees under the UDJA simply because it styles its defenses to a pending claim as a separate declaratory-judgment action, but ... a declaratory action is appropriate if the declaration sought has greater ramifications than the success or failure of the already-pending dispute."). Because we have already concluded that the trial court erred in granting summary judgment on these claims and defenses because fact questions remain to be resolved by the fact finder and remand the case for determination of those issues, we need not determine at this time whether any party would be entitled to attorney's fees.