# IN THE SUPREME COURT OF TEXAS

═══════════

No. 18-0352

═══════════

CHALKER ENERGY PARTNERS III, LLC, ET AL., PETITIONERS,

v.

LE NORMAN OPERATING LLC, RESPONDENT

═══════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════════════

**Argued December 4, 2019**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

In Texas, a deal is, of course, a deal. An agreement as to many things can be oral, sealed by a handshake, even a $10.53 billion handshake.[1] The common law has long recognized that an agreement can be expressed in multiple writings exchanged between the parties.[2] Emails are such

---

[1] *See Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 795 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (holding that there was sufficient evidence to support the jury's finding that Pennzoil and the Getty entities intended to bind themselves to an agreement for Pennzoil to purchase billions of dollars worth of Getty Oil stock).

[2] *See, e.g.*, *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) ("[It is] well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and that a court may determine, as a matter of law, that multiple documents comprise a written contract. In appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument." (footnotes omitted)); *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959) ("It is well settled that separate instruments executed at the same time, between the same parties, and relating to the same subject matter may be considered together and construed as one contract. This undoubtedly is sound in principle when the several instruments are truly parts of the same transaction and together form one entire agreement." (citations omitted)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 132 (AM. LAW INST. 1981) (stating that a memorandum satisfying the statute of frauds "may consist of

writings.[3] Email can be a convenient way to reach agreement, but it is also a distinctly conversational, informal medium. Hitting send may be deliberate; it may be hasty. And so in this brave new world, or at least this braver new world, we must decide whether an email exchange reflected the meeting of minds required for a contract, given the nature of the transaction and the parties' expressed contemplations. And we must begin to give certainty to this developing area of contract law. Today, we hold that the parties' email exchange falls short of an agreement as a matter of law and therefore reverse the judgment of the court of appeals[4] and render judgment for petitioners.

## I

Petitioners are 18 individuals and entities[5] who own working interests they call the Kitty Stroker Assets, which we abbreviate simply to *the Assets*. The Assets, worth hundreds of millions of dollars, are in some 70 oil and gas leases in three Texas Panhandle counties. Petitioners agreed among themselves to develop and eventually sell the Assets; hence, we will refer to them as *the Sellers*. The Sellers completed their development in 2012 and designated one Seller, Chalker,[6] to act

---

several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction").

[3] *See* TEX. BUS. & COM. CODE § 322.007(c) ("If a law requires a record to be in writing, an electronic record satisfies the law.").

[4] 547 S.W.3d 27 (Tex. App.—Houston [1st Dist.] 2017).

[5] Petitioners are Chalker Energy Partners III, LLC; R. Byron Roach, Trustee, LLC; Russell L. Roach; Raptor Petroleum, LLC; BMW Investments, L.P.; Ark-La-Tex Property Investments, LP; Remora Oil & Gas, LLC; Eastern Redbud, LLC; Jimmy Sutton; Vicenergy, LLC; Chris Faulkner d/b/a Terra Geological, LLC; Jerry Caylor; Larry Caylor; John Talley; Erickson Resources, LLC; John G. Kremer, Trustee for the 1st Amendment to the Richard E. and Betty V. Kremer Living Trust Dated 1/3/2002; M&D Exploration, LLC; and Joe D. Nobles.

[6] We use *Chalker* as shorthand for petitioner Chalker Energy Partners III, LLC.

2

as their designated agent during the sale process. Chalker hired financial services firm Raymond James to conduct the sale.

Bidding procedures called for bidders to be given access to a virtual data room of information about the Assets after signing a Confidentiality Agreement. Bidders were given forms to use in making bids and a deadline of November 5, 2012, to submit them to Chalker, which would in turn forward the bids to the Sellers. Each of the Sellers then had 24 hours to decide whether to sell their interests. A bidder could adjust the bid in response, and when the sale was finally approved by the Sellers, Chalker would negotiate a definitive purchase-and-sale agreement, or PSA. The Confidentiality Agreement provided in part:

> ***No Obligation.*** The Parties hereto understand that unless and until a definitive agreement has been executed and delivered, no contract or agreement providing for a transaction between the Parties shall be deemed to exist and neither Party will be under any legal obligation of any kind whatsoever with respect to such transaction by virtue of this or any written or oral expression thereof, except, in the case of this Agreement, for the matters specially agreed to herein. For purposes of this Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement or offer, unless specifically so designated in writing and executed by both Parties.

The Raymond James employee shepherding the sale, Chris Simon, emailed potential buyers announcing the sale of the Assets. Respondent LNO[7] expressed interest, and Simon emailed its principal, David Le Norman, the Confidentiality Agreement, which Le Norman signed. LNO attended a live data room presentation in October.

On November 5, the deadline under the bidding procedures, LNO emailed Simon its bid of $332 million for 100% of the Assets. The bid stated that it was made "subject to the execution of

---

[7] We use *LNO* as shorthand for respondent Le Norman Operating LLC.

a mutually acceptable [PSA]" and included a form PSA. The other high bidder was Jones Energy, and Simon gave each four days to consider raising their bids. LNO increased its bid to $345 million. Chalker chose that bid to submit to the Sellers, but they refused to accept it. After negotiations back and forth, Le Norman emailed Chalker that LNO could no longer pursue the transaction, though he left open the possibility that a deal might still be reached in the future.

The Sellers then offered to sell 67% of the Assets. On November 19, Le Norman emailed Simon without reference to the bidding procedures. The subject line was "RE: Counter Proposal", and the body of the email listed seven terms:

1. $230 M for 67% of the 8/8ths RJ supplied database property set.
2. Eff date same at 9.1.12.
3. Execution of the PSA on or before 11.30.12, closing on or before 12.31.12.
4. Non-compete for ALL owners for one year with two mile halo around any unit being sold.
5. PSA similar to what we returned with the above caveats.
6. Our interest is not subject to the development agreement.
7. All parties staying in will execute JOA, it will be attached to the PSA.

The email added:

We will not be modifying or accepting any changes to the base deal described above and don't want to be jerked around anymore. We will give you till 5:00 pm CST tomorrow to accept. Best we can do and you hopefully understand I have recommended to my Board to pass if the timeline is not met or a counter proposal is sent. Good luck. Dave

On November 20, Chalker's Vice President of Land and Business Development, Bill Dukes, emailed the Sellers the terms in Le Norman's email and recommended that "we move forward with a sale of the Assets to Le Norman based on this offer". Dukes included a ballot and noted that "the offer received from Le Norman has a deadline for response of today at 5:00 PM CST, so we ask for your [i]mmediate attention to this election notice and a response by no later than 4:00 PM today".

4

The Sellers voted to sell, and before Le Norman's deadline, Simon emailed him that the group was "on board to deliver 67% subject to a mutually agreeable PSA. We were calling to discuss next steps and timing. Chalker et al will be turning a PSA tonight to respond to your last draft."

Later that night, Dukes emailed the Sellers that Chalker had "notified Le Norman prior to the 5 00 PM deadline that we had the 67% interest committed to sell and are on board for moving forward with finalizing the PSA and the additional documents associated with the Transaction". Dukes sent LNO a revised draft PSA and noted that his team was taking a few days off for Thanksgiving; he also advised the Sellers to monitor their email for any requests necessary to "complete the preparation of agreements for the sale". Various emails were exchanged referring to the sale. One of the Sellers congratulated one of LNO's private equity investors on "winning the bid", and Jones Energy emailed one of the Sellers stating that it had "heard that we lost the deal again".

Undeterred, Jones Energy presented Chalker with a new offer. On November 22, one of the Sellers informed Chalker that it preferred Jones Energy's offer to LNO's. Chalker replied that Jones Energy's offer had benefits that the "current deal [with LNO] cannot deliver". Chalker thus prepared to "change horses". On November 23, it emailed the Sellers a ballot, and the Sellers elected to sell the Assets to Jones Energy. On November 28, Chalker and Jones Energy executed a PSA. That same day, unaware of what had happened, LNO's general counsel sent Chalker a redlined PSA. Upon learning of the deal with Jones Energy, Le Norman demanded that the Sellers honor the alleged contract entered into through the email exchange.

5

LNO sued the Sellers for breach of contract, arguing that the Sellers breached the agreement that Simon and Le Norman reached through email on November 19 and 20 to sell a 67% interest in the Assets.[8] The Sellers counterclaimed for breach of contract and sought sanctions, damages for LNO's alleged breach of the Confidentiality Agreement and Bid Documents, and declaratory relief that they did not breach any contract with LNO.[9] Both parties moved for summary judgment. The trial court granted the Sellers' motion, concluding that:

- the parties did not intend to be bound to any agreement;

- a PSA was a condition precedent to contract formation; and

- there was no meeting of the minds because the Confidentiality Agreement, bidding procedures, and the data room presentation precluded a binding contract without an executed, delivered PSA.

The trial court entered a take-nothing judgment and dismissed all parties' claims.

The First Court of Appeals reversed. It held that whether the alleged contract was subject to the bidding procedures and whether LNO and the Sellers intended to be bound by the terms set forth in the November 19–20 emails were fact issues precluding summary judgment.[10] The court of

---

[8] LNO also sued Jones Energy for tortious interference but later settled that claim.

[9] The Sellers also argued that LNO's claim was barred by the statute of frauds because it did not specify which interests were being sold; that Simon lacked authority to bind the Sellers to a contract under agency principles; and that the November 20 email could not form a contract under the Texas Uniform Electronic Transactions Act (UETA), TEX. BUS. & COM. CODE §§ 322.001–.021, because the parties did not agree to conduct business electronically and because it lacked an electronic signature. The trial court denied the Sellers' summary judgment motion on the statute of frauds and granted the Sellers' motion on the UETA, concluding that the parties did not agree to conduct business electronically and that the email lacked an electronic signature. The trial court did not rule on the Sellers' summary judgment on agency grounds, so the court of appeals did not consider the Sellers' agency arguments. The court of appeals held that fact issues existed on the UETA and that the trial court properly denied summary judgment on the statute of frauds.

[10] 547 S.W.3d 27, 41, 45 (Tex. App.—Houston [1st Dist.] 2017).

appeals affirmed the remainder of the trial court's judgment and remanded for further proceedings.[11]

We granted Chalker's petition for review.

## II

Many of today's most sophisticated transactions are conducted, in part, through email. In response to this reality, parties often protect themselves through agreements stipulating the conditions upon which they will be bound.[12]

Unquestionably, they are free to do so.[13] "Texas's strong public policy favoring freedom of contract is firmly embedded in our jurisprudence."[14] This Court has reaffirmed time and time again that:

> men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.[15]

Chalker and LNO agreed that "unless and until a definitive agreement has been executed and delivered, no contract or agreement providing for a transaction between the Parties shall be deemed

---

[11] *See id.* at 53.

[12] *See Energy Transfer Partners, L.P. v. Enterprise Prods. Partners, L.P.*, No. 17-0862, ___ S.W.3d ___ (Tex. Jan. 31, 2020) (holding that contractual language similar to the No Obligation Clause created conditions precedent that precluded formation of a partnership).

[13] *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017) (explaining that "[f]reedom of contract is a policy of individual self-determination" and that "individuals can control their destiny and structure their business interactions through agreements with other competent adults of equal bargaining power").

[14] *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016).

[15] *Energy Transfer Partners, L.P.*, ___ S.W.3d at ___; *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005) (both citing *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951)).

7

to exist". By including the No Obligation Clause in the Confidentiality Agreement, Chalker and LNO agreed that a definitive agreement was a condition precedent to contract formation.[16] "A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied."[17]

Just this Term, we explained that "Texas courts regularly enforce conditions precedent to contract formation and reject legal claims that are artfully pleaded to skirt unambiguous contract language, especially when that language is the result of arm's-length negotiations between sophisticated business entities."[18]

LNO argues not that the emails constituted a definitive agreement but that the emails raise a fact issue as to whether a definitive agreement existed. We disagree.

LNO points to *Railroad Commission of Texas v. Gulf Energy Exploration Corp.*[19] and *Foreca, S.A. v. GRD Development Co.*[20] to argue that a fact issue on contract formation exists. In those cases, we held that the question of whether a contemplated formal document was a condition precedent to contract formation or a mere memorial of an already-enforceable contract was a fact

---

[16] *See Energy Transfer Partners, L.P.*, ___ S.W.3d at ___ (holding that contractual language similar to the No Obligation Clause created conditions precedent that precluded formation of a partnership); *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.").

[17] *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).

[18] *Energy Transfer Partners, L.P.*, ___ S.W.3d at ___.

[19] 482 S.W.3d 559 (Tex. 2016).

[20] 758 S.W.2d 744 (Tex. 1988).

question of the parties' intent.[21] But neither involved a writing like the No Obligation Clause here. In *Gulf Energy*, we acknowledged that intent to be bound potentially could be decided as a matter of law.[22] Though we held in *Foreca* that language stating that an agreement was "subject to legal documentation" gave rise to a fact issue,[23] language that no contract will arise until a formal agreement is executed makes clear the parties' intent that the contemplated formal document is a condition precedent to contract formation. Thus, the fact that Chalker's alleged acceptance was "subject to a mutually agreeable PSA" does not create a fact issue; instead, it emphasizes that the definitive agreement referenced in the No Obligation Clause was a condition precedent to contract formation.

The facts here are more like those of *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, in which the Fourteenth Court of Appeals held that the parties' prior agreement that no obligations would arise absent an executed and delivered PSA precluded a fact issue on contract formation.[24] There, ConocoPhillips engaged Morgan Stanley to conduct a sale of several natural gas processing plants and pipelines. The bidding procedures provided that a "Proposal will only be deemed to be accepted upon the execution and delivery by ConocoPhillips of a [PSA(s)]."[25] After submitting several rejected bids, WTG increased its bid. Morgan Stanley then called WTG and stated that

---

[21] *Gulf Energy*, 482 S.W.3d at 572–575; *Foreca*, 758 S.W.2d at 745–746.

[22] *Gulf Energy*, 482 S.W.3d at 575.

[23] *Foreca*, 758 S.W.2d at 746.

[24] 309 S.W.3d 635, 645, 652 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

[25] *Id.* at 638 (brackets in original).

ConocoPhillips had decided to "go forward with" WTG and that the parties had a "deal". But because there were issues with the draft PSA, Morgan Stanley indicated that ConocoPhillips would forward a revised PSA within the next few days. ConocoPhillips' internal emails reflected its intent to sell the assets to WTG, but the parties never executed a PSA.

In the meantime, Targa submitted a bid for multiple assets, including those bid on by WTG. Morgan Stanley advised WTG that ConocoPhillips was considering another offer, and ConocoPhillips and Targa executed a PSA over two months later. WTG sued ConocoPhillips for breach of contract based on the statements in the phone conversation. The court of appeals held that the bidding procedures provided that execution of a PSA was a condition precedent to contract formation; thus, because the parties did not execute a PSA, no contract was formed as a matter of law.[26]

Similar to the parties in *WTG*, Chalker and LNO agreed that a definitive agreement was a condition precedent to contract formation. The court of appeals distinguished *WTG* because the alleged contract in *WTG* was oral, while here the alleged contract is in writing.[27] The distinction is unpersuasive. Although the emails are writings, they do not form a definitive agreement.

While the No Obligation Clause does not define *definitive agreement*, it does make clear that "the term 'definitive agreement' does not include an executed letter of intent or any other

---

[26] *Id.* at 645, 652.

[27] 547 S.W.3d 27, 44 (Tex. App.—Houston [1st Dist.] 2017). The court of appeals also distinguished *WTG* by reasoning that, unlike in that case, "nothing in the agreements [here] indicates, as a matter of law, that the execution of a PSA specifically was a condition precedent to contract formation or that the [emails] could not constitute a 'definitive agreement' as intended under the Confidentiality Agreement". *Id.* at 45. Though the court of appeals is correct that the No Obligation Clause did not specifically require a PSA, it required a definitive agreement, and the emails here do not meet that standard.

preliminary written agreement or offer, unless specifically so designated in writing and executed by both Parties."

Black's Law Dictionary defines *preliminary agreement* as a "precontractual understanding in which two commercial parties allocate their contributions to an undertaking but do not specify all the important terms of the deal."[28] In contrast, *definitive* serves "to provide a final solution or to end a situation" and is "authoritative and apparently exhaustive".[29]

The emails here are more akin to a preliminary agreement than a definitive agreement to sell the Assets, and the parties' dealings suggest that they intended that a more formalized document, like a PSA, would satisfy the definitive-agreement requirement.[30] For example, both parties contemplated executing a PSA prior to finalizing the deal; in fact, they tried to negotiate a PSA several times and failed. Even Le Norman stated that a "PSA similar to what we returned" executed "on or before 11.30.12" was part of his "Counter Proposal". And Simon's acceptance was made "subject to a mutually agreeable PSA." Le Norman also referred to the proposals as a "base deal", and the email made clear that the parties were to execute a PSA in the future.[31] Further, no agreement was "executed and delivered" as required by the No Obligation Clause.

---

[28] *Preliminary Agreement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[29] *Definitive*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993).

[30] We do not suggest that the only document that would have satisfied the definitive-agreement requirement was a PSA, only that the emails here do not constitute a definitive agreement.

[31] LNO emphasizes that the definitive nature of the counteroffer was communicated through Le Norman's statement that he recommended that his board pass "if the timeline is not met or a counter proposal is sent." Yet LNO rejected Chalker's draft PSA sent on November 21 and sent its own redlined PSA on November 28. If the email exchange was as definitive as LNO suggests, further redlines would have been unnecessary.

The court of appeals concluded that there is a fact issue as to whether the email chain satisfies the definitive-agreement requirement because the emails set out the assets to be sold, the purchase price, a closing day, and "other key provisions."[32] The court of appeals also relied on an email containing spreadsheets that Chalker sent to a third party detailing the "interest being sold for each area" and stating that "each area delivers a 67% WI to the buyer". In a $230 million deal, however, these emails and spreadsheets may leave much to the imagination. Indeed, there were still key agreements to be negotiated between Chalker and LNO before a definitive agreement would exist. The parties had yet to agree upon an escrow agreement, a noncompete agreement, or a joint operating agreement.

The court of appeals also cites Le Norman's anticipation that a PSA would be executed "fairly immediately" and the fact that "Chalker . . . and at least one other Seller did not have any substantive objections to LNO's modifications to the form PSA."[33] But LNO and Chalker did not execute a PSA "fairly immediately" or at all. Moreover, LNO continued to modify the PSA and sent a redline on November 28, which suggests that there was still much to be negotiated between Chalker and LNO before finalizing a deal. LNO and the court of appeals emphasize Chalker's declaration that the group was "committed to sell"; one of the Seller's congratulatory messages to LNO; Chalker's reference to the Assets as "what is being sold to LNO"; and testimony from several Sellers that on November 20, 2012, they intended to sell the Assets to LNO.[34] But these

---

[32] 547 S.W.3d at 42.

[33] *Id.* at 43.

[34] *See id.* at 43–44.

12

congratulatory comments and one-off musings of several Sellers out of a group of 18 working interest owners could be construed many ways. We cannot corral this evidence to create a fact issue in light of the unambiguous No Obligation Clause agreed to by the parties.[35]

If mere proposals that contemplate a later-executed PSA and the subsequent exchanging of unagreed-to drafts are sufficient to raise a fact question on the existence of a definitive agreement, No Obligation Clauses will be stripped of much of their meaning and utility. Even worse, these clauses would mislead parties operating under the assumption that they can freely engage in negotiations without binding themselves to proposals in an email exchange. By including the No Obligation Clause in the Confidentiality Agreement, the Sellers and LNO provided themselves with the freedom to negotiate without fear of being bound to a contract. The record here reflects that they were doing just that.

### III

LNO argues that if the No Obligation Clause created a condition precedent to contract formation, there is a fact issue as to whether the Sellers waived that condition through their conduct surrounding the November 19–20 emails. Chalker responds that the emails were part of ongoing negotiations subject to the bidding procedures and that any deviation from the bidding procedures did not indicate an intent to waive the definitive-agreement requirement in the Confidentiality Agreement. We hold that the negotiations were subject to the bidding procedures and the Confidentiality Agreement and that the parties did not waive their right to a definitive agreement.

---

[35] *See First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (reiterating that extrinsic evidence cannot be used to create an ambiguity in contractual language).

LNO and Chalker's negotiations beginning November 19 remained subject to the bidding procedures and the Confidentiality Agreement. LNO and the court of appeals point to the fact that Le Norman's November 19 email was sent after the initial bid process concluded and LNO's statement after the bidding procedures ended that it could "no longer pursue the . . . transaction as altered by the Sellers" to support the existence of a fact issue on whether the emails were subject to the bidding procedures.[36] However, the subject of Le Norman's November 19 email was "Counter Proposal", which indicates that the negotiations were a continuation of their earlier attempts to negotiate a sale of the Assets. Further, by providing that the Confidentiality Agreement would terminate after one year or on the date that the parties entered into a further written agreement covering the confidentiality of the Confidential Information, the parties made clear that the Confidentiality Agreement would govern negotiations for the sale of the Assets, even those occurring after the November 5, 2012 deadline. Chalker also protected itself in the Confidentiality Agreement by affirming its right to "conduct the process relating to a possible transaction in any manner it deems appropriate or change the procedure for conducting that process." Because the bidding procedures and the Confidentiality Agreement applied to the November 19–20 negotiations, we next turn to whether the Sellers waived their right to a definitive agreement.

Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."[37] While ordinarily a fact question, when the surrounding facts and

---

[36] 547 S.W.3d at 41–42.

[37] *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam).

14

circumstances are undisputed, waiver may be decided as a matter of law.[38] "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right."[39] In other words, to establish waiver by conduct, that conduct must be "unequivocally inconsistent with claiming a known right."[40]

LNO argues that the Sellers impliedly waived their right to a definitive agreement through their conduct. Thus, to raise a fact issue on waiver of that right, LNO must point to evidence of an intentional relinquishment of that right or intentional conduct inconsistent with claiming that right. LNO does neither.

LNO and the court of appeals cite various inconsistencies between the bidding procedures and the November 19–20 emails. For one, Le Norman's email deviated from the format required by the bidding procedures, requested a more expedited response from the Sellers than the 24 hours allotted by the bidding procedures, and did not state that it was made in accordance with the bidding procedures. The court of appeals also noted that the Sellers continued to negotiate with LNO despite this alleged deviation and did not object to LNO's deviation from the bidding procedures. LNO points to Chalker's statement that the group was "committed to sell" and argues that this commitment would have been impossible if it had been contingent on executing a PSA.

---

[38] *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999) (per curiam).

[39] *Jernigan*, 111 S.W.3d at 156.

[40] *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (quoting *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005)).

As noted, waiver, while normally a fact issue, can be decided as a matter of law. Here, the parties stipulated that a definitive agreement, such as a PSA, was a condition precedent to contract formation. While the November 19–20 negotiations contained a different deadline and format than those contemplated by the bidding procedures, this is no evidence of an intentional relinquishment of the right to a definitive agreement secured by the No Obligation Clause. The fact that Le Norman's email was sent after the initial bid process concluded is not evidence of waiver. While Le Norman may not have stated in his email that the proposal was made in accordance with the bidding procedures, he maintained that execution of a PSA was part of the "base deal" described in his email. And Simon clarified in his November 20 email that the group was "on board . . . subject to a mutually agreeable PSA." If anything, both Le Norman and the Sellers' conduct was *consistent* with their right to a definitive agreement. Chalker and Le Norman's continued references to execution of a PSA suggest that the parties did not intend to deviate from the bidding procedures and wanted to make clear that a definitive agreement such as a PSA was, in fact, still required for the sale to be consummated. Thus, we hold that the Sellers did not waive their right to a definitive agreement as a matter of law.

\* \* \* \* \*

We hold that, as a matter of law, Chalker and LNO did not execute and deliver a definitive agreement as required by the Confidentiality Agreement.[41] Accordingly, we reverse the court of appeals and render judgment for petitioners.

 

Nathan L. Hecht
Chief Justice

Opinion delivered: February 28, 2020

---

[41] Because we hold that the parties did not form a contract as a matter of law, the parties' UETA, statute of frauds, and agency issues are moot.